

NUMBER 13-11-00490-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG

---

**IN THE ESTATE OF THOMAS TREVINO ARAGUZ III, DECEASED**

---

**On appeal from the 329th District Court
of Wharton County, Texas.**

---

# O P I N I O N

**Before Chief Justice Valdez and Justices Rodriguez and Longoria
Opinion by Chief Justice Valdez**

After volunteer firefighter Thomas Trevino Araguz III died in the line of duty, his mother, Simona Longoria, filed this suit to declare his marriage to Nikki Araguz void as a matter of law on the grounds that it constituted a same sex marriage.[1]  *See* TEX. CONST. art. I, § 32(a) ("Marriage in this state shall consist only of the union of one man and one woman."); TEX. FAM. CODE ANN. § 6.204(b) (West 2006) ("A marriage between persons of

---

[1]   Specifically, Simona filed an Application for Letters of Administration, Application for Determination of Heirship, Petition to Declare Marriage Void, Application for Temporary Restraining Order, and Motion to Transfer Venue to District Court.

the same sex or a civil union is contrary to the public policy of this state and is void in this state."). Subsequently, Thomas's ex-wife, Heather Delgado, intervened as next friend on behalf of their two minor children also contending that Thomas's marriage to Nikki was void as a matter of law because it constituted a same sex marriage. *See* TEX. CONST. art. I, § 32(a); TEX. FAM. CODE ANN. § 6.204(b). Nikki answered the suit and filed a counterclaim to declare the marriage valid. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.003–.004 (West 2008). The parties filed opposing motions for summary judgment. *See* TEX. R. CIV. P. 166a(c), (i). The trial court granted Simona and Heather's motions and denied Nikki's motion. The court then entered a final judgment in favor of Simona and Heather declaring the marriage void as a matter of law. *See* TEX. FAM. CODE ANN. § 6.204(b). For the reasons set forth below, we conclude that the trial court erred in granting the summary judgment because there is a genuine issue of material fact regarding Nikki's sex and whether the marriage was a same sex marriage. *See* TEX. R. CIV. P. 166a(c), (i). Accordingly, we reverse the trial court's judgment and remand for further proceedings consistent with this opinion. *See* TEX. R. APP. P. 43.2(b).

## I. BACKGROUND[2]

Nikki was born in California in 1975 with male sex organs, including a penis, testes, and scrotum, and without any female sex organs, such as a vagina or uterus. The name "Justin Graham Purdue" appeared on Nikki's original birth certificate with the designation

---

[2] The facts stated in this background section are not in dispute. *See* TEX. R. APP. P. 38.1(g) ("In a civil case, the court will accept as true the facts stated unless another party contradicts them."). We also note that although we refer to Nikki using feminine terms throughout this opinion, as Nikki and Heather have in their appellate briefs, we do so strictly for ease of reference and to be courteous and respectful in stating the basic reasons for our decision. *See* TEX. R. APP. P. 47.1; TEX. CODE OF JUDICIAL CONDUCT, Cannon 3B(4) ("A judge shall be patient, dignified and courteous to litigants . . . ."); *see Littleton v. Prange*, 9 S.W.3d 223, 224 (Tex. App.—San Antonio 1999, pet. denied) (referring to appellant in feminine terms even though her sex was disputed and noting that such references were "out of respect for the litigant" and have "no legal implications").

that Nikki was "male." Nevertheless, since early childhood, Nikki was largely taken by others as a girl. She always reacted favorably to this. By the age of four or five, she expressed feelings of being female. Nikki began wearing female clothes as an adolescent and has continued to do so for essentially all of her life. At the age of eighteen, Nikki's physician diagnosed her with "gender dysphoria" (also known as "gender identity disorder"), a medical condition whereby an individual has longstanding and persistent feelings of being a member of the opposite sex. Nikki's physician started her on feminizing hormone therapy, and she continued living as a female.

At the age of twenty-one, Nikki filed a petition in the 245th District Court of Harris County, Texas to have her name changed. In the petition, Nikki states the following: "I, Justin Purdue, am a woman with male anatomy, working toward a sex change. I have been living and working as a woman for over one year and seek to make my new name legal and permanent." On February 9, 1996, the district court issued an order granting a name change from "Justin Graham Purdue" to "Nikki Paige Purdue." Subsequently, on April 27, 1996, Nikki filed an application in California to amend her birth certificate to reflect the name change. Thereafter, on August 21, 1996, the State of California issued an amended birth certificate reflecting the name change.

After changing her name, Nikki obtained a driver's license from Kansas with the designation that she is female. She then used the Kansas driver's license to obtain a Texas driver's license with the designation that she is female.

On August 19, 2008, Nikki presented her Texas driver's license to the County Clerk of Wharton County, Texas to obtain a marriage license. The marriage license indicates that Nikki is a "woman." On August 23, 2008, Thomas and Nikki were married in a

3

ceremonial wedding in Wharton County.  At the time of the wedding, Nikki had male sex organs, but she was living as a woman.  After the wedding, Thomas and Nikki cohabitated as husband and wife until the time of Thomas's death in 2010.

In October of 2008, Nikki underwent "genital reassignment" or "neocolporrhaphy" surgery in which her testes were removed and her penis and scrotum were surgically altered to resemble and function as a labia, clitoris, and vagina.  The procedure was performed in Texas by Dr. Marci Bowers, a Texas licensed physician.  The parties dispute whether Thomas was aware of Nikki's operation.  On April 28, 2010, just two months before his death, Thomas gave a deposition in a family court proceeding involving the custody of his two sons in which he testified that he did not know that Nikki had undergone genital reassignment surgery.  Thomas testified that he did not know that his wife was "formerly male" or that she had any type of "gender surgery."  According to Thomas's testimony, Nikki represented herself as "female" prior to their marriage.  Nikki maintains that before Thomas's deposition, she and Thomas agreed to take the position that she was female from birth.  According to Nikki, Thomas was fully aware of the genital reassignment surgery.

Thomas died on July 3, 2010.  On July 15, 2010, Nikki filed a petition in the superior court of San Francisco County, California requesting the issuance of a new birth certificate reflecting the change of her sex from male to female.  On July 20, 2010, the California court entered an order changing Nikki's sex from male to female.  Thereafter, on August 30, 2010, the State of California issued a birth certificate stating that Nikki is "female."

4

## II. Procedural History

As set forth above, Thomas's mother, Simona, initiated this suit on July 12, 2010 seeking to have Thomas's marriage to Nikki declared void as a same sex marriage. *See* Tex. Fam. Code Ann. § 6.204(b). Thomas's ex-wife, Heather, subsequently intervened as next friend on behalf of their two minor children also seeking to have the marriage declared void. *See id.* Nikki answered the suit and filed a counterclaim to declare the marriage valid. The parties then filed opposing motions for summary judgment as follows.

### A. Heather's Motion for Summary Judgment

On October 26, 2010, Heather filed a traditional motion for summary judgment, with attached evidence,[3] asserting the following grounds for summary judgment:

(1) The marriage was void pursuant to Article I, Section 32 of the Texas Constitution, which provides that "marriage in this state shall consist only of the union of one man and one woman." Tex. Const. art. I, § 32(a).

(2) The marriage was void pursuant to Section 6.204(b) of the Texas Family Code, which provides that "a marriage between persons of the same sex is . . . contrary to the public policy of this state and is void as a matter of law." Tex. Fam. Code Ann. § 6.204(b).

(3) As a matter of law, no informal marriage could have existed between Thomas and Nikki because Section 2.401 of the Texas Family Code provides for informal marriage only between a man and a woman, as

---

[3] The evidence attached to Heather's motion for summary judgment included the following: (1) Nikki's original birth certificate stating that Nikki was born "male" on June 4, 1975 in Carmel, California and named "Justin Graham Purdue"; (2) an application for a name change completed by "Justin Graham Purdue," identifying the applicant's sex as "M" or male and stating as the cause for the name change: "I, Justin Purdue, am a woman with male anatomy, working toward a sex change. I have been living and working as a woman for over one year and seek to make my new name legal and permanent"; (3) an order of the 245th District Court of Harris County granting the name change as of February 2, 1996; (4) an application for amendment of birth certificate to reflect the court ordered change of name completed by Nikki and dated April 27, 1996; and (5) Nikki's answers to requests for admissions in the instant suit, admitting the following: (a) Nikki was born Justin Graham Purdue; (b) the birth certificate of Justin Graham Purdue lists his sex as male; (c) Justin Graham Purdue was born with a penis; (d) Justin Graham Purdue was born with testes; (e) Justin Graham Purdue was born without a vagina; (f) Justin Graham Purdue was born without a uterus; (g) Nikki had a penis on the day of the issuance of the marriage license for Nikki and Thomas; (h) Nikki had testes on the day of the issuance of the marriage license for Nikki and Thomas; and (i) Nikki had genital reassignment surgery in October of 2008.

decided by the San Antonio Court of Appeals in *Littleton v. Prange*, 9 S.W.3d 223, 231 (Tex. App.—San Antonio 1999, pet. denied). *See* TEX. FAM. CODE ANN. § 2.401 (West 2006).

*See* TEX. R. CIV. P. 166a(c).

## B. Nikki's Motion for Summary Judgment

On April 21, 2011, Nikki filed a "no evidence" motion for summary judgment asserting that she was entitled to judgment as a matter of law because Heather and Simona could produce no evidence that Thomas and Nikki did not have a valid ceremonial marriage or, alternatively, a valid informal marriage. *See* TEX. R. CIV. P. 166a(i).[4]

## C. Heather's Response to Nikki's Motion

On May 13, 2011, Heather filed her response to Nikki's motion for summary judgment with evidence attached.[5] In her response, Heather argued that summary judgment was not proper because of the following:

(1) "It is undisputed that as of the date of the statutory marriage between Thomas . . . and Nikki . . . , the participants in the ceremony were both men."

(2) No informal marriage could have existed between Thomas and Nikki after the genital reassignment surgery in 2008 because "Nikki . . . took no steps to legally change her sex from male to female until July 15, 2010," after Thomas's death.

(3) No informal marriage could exist because, under *Littleton*, a person's

---

[4] We note that on appeal, Nikki asserts that the motion was "incorrectly styled as a 'no evidence' motion [because] . . . in substance the motion was unmistakably a traditional motion." We also note that there was no evidence attached to the motion or referenced therein. We disagree with Nikki's assertion that the motion was a traditional motion. *See* TEX. R. CIV. P. 166a(c). In form and substance, the motion was a no evidence motion. *See* TEX. R. CIV. P. 166a(i).

[5] The following exhibits were attached to Heather's response: (1) affidavit of Edward C. Burwell; (2) Nikki's responses to requests for admissions; (3) certificate of live birth of Justin Graham Purdue; (3) application for name change for Justin Graham Purdue; (4) order granting the application for name change; (5) Nikki's application for amendment of birth record to reflect the name change; (6) Nikki's memorandum of points and authorities in support of her petition for a change of gender; (7) Nikki's amended birth certificate; and (8) a transcript of the California court's proceedings regarding Nikki's request for a legal change of gender.

gender, while subject to physical manipulation for the purpose of assuming the appearance of an alternate gender, is nonetheless governed by the gender of the person at birth, as determined by both anatomical and genetic examinations of the person. *See Littleton*, 9 S.W.3d at 224.

## D. Simona's Response to Nikki's Motion

On April 21, 2011, Simona filed her response to Nikki's motion for summary judgment with evidence attached.[6] In her response, Simona argued that a "no evidence" summary judgment was improper because Nikki had the burden of proof to establish the existence of an informal marriage. *See State v. Mireles*, 904 S.W.2d 885, 888 (Tex. App.—Corpus Christi 1995, pet. ref'd) ("The burden of proof is on the one seeking to establish the existence of such a marriage."); *but see* TEX. FAM. CODE ANN. § 1.101 (West 2006) ("[E]very marriage entered into in this state is presumed to be valid unless expressly made void by Chapter 6 or unless expressly made voidable by Chapter 6 and annulled as provided by that chapter.").

## E. Simona's Motion for Summary Judgment

Also on April 21, 2011, Simona filed a traditional motion for summary judgment, with attached evidence,[7] asserting the following grounds for summary judgment:

---

[6] The evidence attached to Simona's response was the same evidence attached to her traditional motion for summary judgment set forth in footnote 7.

[7] The evidence attached to Simona's motion for summary judgment included the following: (1) certificate of live birth for Justin Graham Purdue dated June 18, 1975; (2) verified pleading of Justin Graham Purdue in Cause No. 96-07867 in the 245th District Court of Harris County, Texas; (3) order granting name change in Cause No. 96-07867 in the 245th District Court of Harris County, Texas; (4) amended certificate of live birth of Justin Graham Purdue dated August 21, 1996; (5) Nikki's memorandum of points and authorities in support of petition for name change; (6) transcript of hearing on Nikki's petition for change of gender dated July 20, 2010; (7) Nikki's certificate of live birth; (8) marriage license for Thomas and Nikki; (8) Houston Independent School District records for Justin Graham Purdue; (9) Cypress-Fairbanks Independent School District records for Justin Graham Purdue; (10) Aldine Independent School District records for Justin Graham Purdue; (11) "medical records of Justin Graham Purdue aka Nikki Purdue aka Nikki Araguz aka Nikki Mata from Gulf Coast Medical Center"; (12) "medical records of Justin Graham Purdue aka Nikki Purdue aka Nikki Araguz aka Nikki Mata from Dr. Juan Garza, Dr. Esther Perez, Houston Area Community Services"; (13) "medical records of Justin Graham Purdue aka Nikki Purdue aka Nikki

7

(1) The purported marriage between Thomas and Nikki was void because at the time of their marriage, both Thomas and Nikki were males. *See* TEX. FAM. CODE ANN. § 6.204(b).

(2) No informal marriage could exist between Thomas and Nikki after the date of Nikki's operation (October 7, 2008) based on *Littleton*. *See Littleton*, 9 S.W.3d at 230.

(3) The purported marriage is void based on judicial estoppel because Nikki previously claimed that she was a male in a separate court proceeding.

*See* TEX. R. CIV. P. 166a(c).

## F. Nikki's Response to Heather and Simona's Motions

On May 13, 2011, Nikki filed her response to Heather and Simona's motions for summary judgment with evidence attached.[8] In her response, Nikki argued that summary judgment was improper based on the following grounds:

(1) *Littleton* was overruled by the 2009 amendment to section 2.005 of the Texas Family Code, which added "an original or certified copy of a court order relating to the applicant's name change or sex change" to the list of acceptable "proof of identity and age" for purposes of obtaining a marriage license. *See* TEX. FAM. CODE ANN. § 2.005(b)(8) (West Supp. 2013).

(2) Nikki's gender has always been female, as evidenced by the birth certificate issued by the State of California on August 30, 2010 stating that she is "female" and the corresponding judgment of the California

Araguz aka Nikki Mata from Dr. Marci Bowers"; (14) "medical records of Justin Graham Purdue aka Nikki Purdue aka Nikki Araguz aka Nikki Mata from Mount Saint Rafael Hospital"; (15) Nikki's responses to Simona's requests for admissions; (16) Nikki's responses to Simona's written interrogatories; (17) excerpts of Nikki's deposition in Cause No. 44,575 in the 329th Judicial District Court of Wharton County, Texas; (18) excerpts of Nikki's deposition in Cause No. 42,122 in the 329th Judicial District Court of Wharton County, Texas; (19) excerpts of Thomas's deposition in Cause No. 42,122 in the 329th Judicial District Court of Wharton County, Texas; and (20) Thomas's certificate of live birth.

[8] The evidence attached to Nikki's response included the following: (1) affidavit of Jim Paulsen; (2) affidavit of Collier Cole, Ph.D.; (3) Nikki's birth certificate; (4) Texas Family Code Section 2.005; (5) Nikki's affidavit; (6) Simona's exhibit F; (7) Nikki's jail records stating that she is "F" or female; (8) Thomas and Nikki's application for a marriage license; (9) 00112 of Houston Community Service medical records; (10) excerpts from the California health and safety code; (11) Steve Chelotti's affidavit; (12) marriage license for Thomas and Nikki; (13) Nikki's Texas driver's license; (14) marriage compact of Nikki and Thomas; (15) California court order for change in Nikki's birth certificate; and (16) Dr. Bower's medical report.

court, to which the court must give full faith and credit by ruling that the other two birth certificates issued by the State of California in 1975 and 1996, respectively, and her discovery answers are a "nullity" that cannot be proper summary judgment evidence. *See* U.S. CONST. art. IV, § 1.[9]

(3) Nikki was female at the time of the ceremonial marriage because according to the World Professional Association for Transgender Health ("WPATH") standards of care, she "successfully transitioned" to the female sex years before she met Thomas.[10]

(4) Nikki was female prior to her genital reassignment surgery, as evidenced by her medical records prepared by Marci Bowers, M.D.[11]

(5) An informal marriage existed between Thomas and Nikki. *See* TEX. FAM. CODE ANN. § 2.401(a).

(6) Simona did not plead judicial estoppel.

(7) The Equal Protection clause of the Fourteenth Amendment to the United States Constitution requires Texas to recognize "a post-operative transgendered individual's current sex." *See* U.S. CONST. amend. XIV, § 1.

## G. The Trial Court's Ruling

On May 26, 2011, the trial court granted Heather and Simona's traditional motions for summary judgment and denied Nikki's no evidence motion for summary judgment.

---

[9] In connection with this assertion, Nikki relies on section 103430(d) of the California Health and Safety Code, which states in relevant part that "[n]o reference shall be made in the new birth certificate [for a registrant whose sex has been surgically altered] . . . that it is not the original birth certificate of the registrant." CAL. HEALH & SAFETY CODE § 103430(d).

[10] Nikki relies on the affidavit of Collier Cole, Ph.D., a Texas licensed clinical psychologist and full professor in the University of Texas Medical Branch, Galveston's Department of Psychiatry and Behavioral Sciences, who states that because Nikki "pursued this transition in accordance with the standards of care of the World Professional Association for Transgender Health, [he] regard[s] her medically and psychologically as female." He also states that "[s]urgery per se is not the definitive point that makes someone female." According to Dr. Cole, "it is completion of real life experiences which documents such she had this condition at birth, recognized such as she grew up, and took the steps to resolve this issue."

[11] Nikki relies on the medical records prepared by Marci Bowers, M.D. in connection with her "genital reassignment surgery" or "neocolporrhaphy." The records indicate a preoperative and postoperative diagnosis of "gender dysphoria, male to female transexualism." The records describe Nikki as "a 33 year old, phenotypic female, who has followed the WPATH Standards of Care." Based on a physical examination, Dr. Bowers described Nikki as a "[p]leasant thin woman in no apparent distress."

9

*See* TEX. R. CIV. P. 166a(c), (i).  The trial court's judgment declares that Thomas was not married on the date of his death and that any purported marriage between Thomas and Nikki was void as a matter of law.  The remaining issues pertaining to the estate were severed from this cause, and the trial court's judgment became final and appealable.

## III. ISSUES ON APPEAL

On appeal, Nikki argues that the trial court erred in granting summary judgment for the following reasons:

(1) Thomas and Nikki's marriage was valid because the uncontroverted summary judgment evidence established that Nikki was female.

(2) Thomas and Nikki's marriage was validated by the 2009 amendments to the Texas Family Code.

(3) Thomas and Nikki's marriage was valid under the United States and Texas Constitutions, considering that—

   a. The California judgment and birth certificate identifying Nikki's sex as female are entitled to full faith and credit in Texas, and

   b. The trial court's judgment invalidating the marriage violates Nikki's rights under the Texas Equal Rights Amendment and the Fourteenth Amendment to the United States Constitution.

(4) Thomas and Nikki's marriage would be valid in most jurisdictions.

(5) The *Littleton* decision is not controlling.

(6) The judgment cannot be affirmed based on judicial estoppel.

(7) Even if Thomas and Nikki's marriage were incorrectly deemed a "same sex" marriage, Texas courts cannot constitutionally declare it void on that basis.

## IV. STANDARD OF REVIEW

"We review a summary judgment de novo."  *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009) (citing *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003)).  "We review the evidence presented in

10

the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Id.* (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 208 (Tex. 2002)). "The party moving for traditional summary judgment bears the burden of showing no genuine issue of material fact exists and it is entitled to judgment as a matter of law." *Id.* (citing TEX. R. CIV. P. 166a(c); *Knott*, 128 S.W.3d at 216). "When both sides move for summary judgment and the trial court grants one motion and denies the other, we review the summary judgment evidence presented by both sides and determine all questions presented." *Id.* (citing *Comm'rs Court of Titus County v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997)). "In such a situation, we render the judgment as the trial court should have rendered." *Id.* (citing *Agan*, 940 S.W.2d at 81).

In this case, the parties filed competing motions for summary judgment in which each litigant asserted that there were no genuine issues of material fact; however, the Texas Supreme Court has explained as follows:

> When both sides file motions for summary judgment, each litigant in support of his own motion necessarily takes the position that there is no genuine issue of fact in the case and that he is entitled to judgment as a matter of law. While it does not necessarily follow that when both sides file motions for summary judgment there is no genuine fact issue in the case, it does indicate that the legal controversy is one which generally turns upon an interpretation of some rule of law and both sides are prepared to present their respective contentions with reference thereto.

*Ackermann v. Vordenbaum*, 403 S.W.2d 362, 364–65 (Tex. 1966); *see also Coker v. Coker*, 650 S.W.2d 391, 392 (Tex. 1983) (reversing summary judgment and remanding for trial even though both sides moved for summary judgment and asserted settlement

11

agreement was unambiguous).

## V. APPLICABLE LAW

The Texas Constitution defines a marriage as "the union of one man and one woman." *See* TEX. CONST. art. I, § 32(a). Furthermore, the Texas Family Code provides that "[a] marriage between persons of the same sex or a civil union is contrary to the public policy of this state and is void in this state." TEX. FAM. CODE ANN. § 6.204(b). Consistent with the foregoing, the Texas Family Code states that "[a] license may not be issued for the marriage of persons of the same sex," *id*. § 2.001(b) (West 2006), and it also provides that an informal marriage may exist only between a "man and woman." *Id*. § 2.401(a).

"[I]n order to provide stability for those entering into the marriage [relationship] in good faith . . . it is the policy of this state to preserve and uphold each marriage against claims of invalidity unless a strong reason exists for holding the marriage void or voidable." *Id*. § 1.101 (West 2006). "The presumption in favor of the validity of a marriage . . . is one of the strongest, if, indeed, not the strongest, known to law." *Tex. Employers' Ins. Ass'n v. Elder*, 282 S.W.2d 371, 373 (Tex. 1955). "The presumption is, in itself, evidence, and may even outweigh positive evidence to the contrary." *Id*. "The strength of the presumption increases with the lapse of time, acknowledgments by the parties to the marriage, and the birth of children." *Id*. Thus, "the well-established rule [is] that, when a marriage has been duly established its legality will be presumed, and the burden of proving the contrary is upon the one attacking its legality." *Id*. However, because same sex marriages are "expressly made void by Chapter 6 [of the Texas Family Code]," they are not presumed to be valid. TEX. FAM. CODE ANN. § 1.001.

## VI. DISCUSSION

"Over the course of the last decades, States with same-sex prohibitions have moved toward abolishing them." *Lawrence v. Texas*, 539 U.S. 558, 570 (2003). Twelve states and the District of Columbia have "decided that same-sex couples should have the right to marry and so live with pride in themselves and their union and in a status of equality with all other married persons." *United States v. Windsor*, 133 S.Ct. 2675, 2689 (2013). In 2013, the United States Supreme Court struck down the provision of the Defense of Marriage Act ("DOMA") that prohibited the federal government from recognizing same sex marriages. *See id.* at 2696 ("The federal statute is invalid, for no legitimate purpose overcomes the purpose and effect to disparage and to injure those whom the State, by its marriage laws, sought to protect in personhood and dignity.") (citing 1 U.S.C. § 7). To date, these developments have not affected the law banning same sex marriages in Texas. *See* Tex. FAM. CODE ANN. § 6.204(b).

The dispute in this case is whether Thomas and Nikki had a same sex marriage in contravention of Texas law. *See* TEX. CONST. art. I, § 32(a); TEX. FAM. CODE ANN. § 6.204(b). The resolution of the dispute will require a determination of Nikki's sex, an issue on which the parties strongly disagree.[12] In granting the summary judgment, the trial court declared that the marriage was void under Texas law. *See* TEX. FAM. CODE ANN. § 6.204(b). In doing so, it necessarily found that Nikki was a man at the time of Thomas's death such that the marriage was between two men in violation of the Texas Constitution

---

[12] Heather's brief states that "[t]he determination of . . . [Nikki's] gender is the only issue in this case." Likewise, Simona's brief states that the "[t]he validity of the marriage before this Court revolves around a central issue: Is Nikki Araguz male?"

13

and the Texas Family Code. *See* TEX. CONST. art. I, § 32(a); TEX. FAM. CODE ANN. § 6.204(b). We conclude that this was an error because, on the record before us, the question of Nikki's sex is a disputed issue of material fact that precludes summary judgment. *See Tex. Commerce Bank v. Grizzle*, 96 S.W.3d 240, 252 (Tex. 2002) ("Summary judgment is appropriate only when there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.").

## A. Was Summary Judgment Proper Based on *Littleton*?

As set forth above, Heather and Simona asserted that summary judgment was proper based on the *Littleton* decision by the San Antonio Court of Appeals. *See Littleton*, 9 S.W.3d at 224. Therefore, we will address whether the trial court's summary judgment must be upheld based on *Littleton*.

*Littleton* involved a final summary judgment rendered against an individual named Christie Lee Littleton who was born with male sex organs, was later diagnosed with gender dysphoria, and underwent medical treatment for the condition, "which culminated in a complete sex reassignment" such that she became "medically a woman." *Id.* at 224–25. Nevertheless, the trial court ruled that Christie's subsequent marriage to Jonathan Mark Littleton was void as a same sex marriage based on Christie's original birth certificate stating that she was "male." *Id.* at 225.

Christie appealed to the Fourth Court of Appeals in San Antonio, which was unable to reach a unanimous decision. Two of the three justices who heard the case agreed to affirm the trial court's judgment on the basis that Christie was not a surviving spouse under the Texas wrongful death statute. *Id.* at 231–32. Chief Justice Hardberger wrote an opinion, designated as the majority opinion; however, the other two panel members

14

did not join his opinion, but instead wrote separately. *Id.* at 223–34. Justice Angelini wrote a concurring opinion, *id.* at 231–32, and Justice Lopez wrote a dissenting opinion. *Id.* at 232–34.

The central theme of Chief Justice Hardberger's opinion was that Texas law does not recognize any individuals "as having successfully changed their sex." *Id.* at 230. In her concurring opinion, Justice Angelini was careful to limit her discussion to the "pre-operative distinction between Christie Lee Littleton and a typical male." *Id.* at 232. Although Justice Angelini did not purport to express a position on the issue of whether Texas law recognizes that an individual may change his or her sex, her concurring opinion focuses on Christie's pre-operative condition and fails to address Christie's post-operative condition, thus implying that Texas law does not recognize the possibility of a sex change. *See id.* at 231–32.

Heather and Simona relied extensively, if not exclusively, on the *Littleton* decision as authority for their motions for summary judgment. Yet, even if *Littleton* was correct at the time it was decided in 1999, it is possible that the legal landscape has changed since then. And in fact, it has.

In 2009, the legislature amended the family code to add a court order related to an applicant's "sex change" as a form of acceptable proof to establish an applicant's identity and age, and thus, eligibility, to obtain a marriage license. *See* TEX. FAM. CODE ANN. § 2.005(b)(8). The parties dispute the meaning of the amendment. Nikki cites it as her primary authority, while Heather and Simona dismiss it as being, in essence, meaningless surplusage that did not have the effect of legitimizing any individual's "sex change" under Texas law. We disagree with Heather and Simona on this point.

"A statute is presumed to have been enacted by the legislature with complete knowledge of the existing law and with reference to it." *Acker v. Tex. Water Comm'n*, 790 S.W.2d 299, 300 (Tex. 1990). Furthermore, "the legislature is never presumed to do a useless act." *Hunter v. Fort Worth Cap. Corp.*, 620 S.W.2d 547, 551 (Tex. 1981). Courts "will not read statutory language to be pointless if it is reasonably susceptible of another construction." *City of LaPorte v. Barfield*, 898 S.W.2d 288, 292 (Tex. 1995) (citing *Chevron Corp. v. Redmon*, 745 S.W.2d 314, 316 (Tex. 1987)).

The Texas Code Construction Act provides in relevant part:

In enacting a statute, it is presumed that:

> (a) compliance with the constitutions of this state and the United States is intended;
>
> ***(b) the entire statute is intended to be effective;***
>
> (c) a just and reasonable result is intended;
>
> (d) a result feasible of execution is intended; and
>
> (e) public interest is favored over any private interest.

TEX. GOV'T CODE ANN. § 311.021 (West 2013) (emphasis added). The Act also provides as follows:

> (a) Words and phrases shall be read in context and construed according to the rules of grammar and common usage.
>
> (b) Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly.

*Id.* § 311.011 (West 2013); *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651 (Tex. 2006) ("Ordinarily, the truest manifestation of what legislators intended is what lawmakers enacted, the literal text they voted on.").

Read in the context of the constitutional definition of the marriage relationship, the statutory term "same sex marriage" means a marriage between two men or a marriage between two women. *See* TEX. CONST. art. I, § 32(a); TEX. FAM. CODE ANN. § 6.204(b). The term "sex change" is also used in the marriage statute, but it is not defined. *See* TEX. FAM. CODE ANN. § 2.005(b)(8). Therefore, we give the term its "ordinary meaning." *Owens Corning v. Carter*, 997 S.W.2d 560, 572–73 (Tex. 1999) ("When interpreting a statute, we begin with the words of the statute itself, giving words their ordinary meaning.") (citing *In re Bay Area Citizens Against Lawsuit Abuse*, 982 S.W.2d 371, 380 (Tex. 1998)).

Here, the legislature has clearly used the words "sex change" in a way that establishes that a person who has had a sex change is eligible to marry a person of the opposite sex such that the marriage is between one man and one woman, as set forth in the Texas Constitution. *See* TEX. CONST. art. I, § 32(a). The statute provides in relevant part as follows:

**PROOF OF IDENTITY AND AGE.**

> (a) The county clerk shall require proof of the identity and age of each applicant [for a marriage license].

> (b) The proof must be established by . . .

>> (8) an original or certified copy of a court order relating to the applicant's name change or ***sex change*** . . . .

*See* TEX. FAM. CODE ANN. § 2.005(a), (b)(8) (emphasis added).

The statute clearly contemplates a court of competent jurisdiction issuing an order recognizing and essentially certifying an individual's change of sex, much like a name change. However, unlike a name change, which is governed by Chapter 45 of the Texas Family Code, there is no corresponding chapter of the family code governing a sex

17

change. *See id*. §§ 45.001–.006 (West 2002). There are no rules or standards set forth in the statute, and the legislative history is silent with respect to this provision of the statute. To date, there have been two failed attempts to delete the words "sex change" from the statute. *See* Tex. S.B. 723, 82d Leg., R.S. (proposing to remove the words "or sex change" from section 2.005(b)); Tex. H.B. 3098, 82d Leg., R.S. (same). However, the statute's future is not at issue in this case. Today, we deal with the statute as it was enacted by Texas lawmakers and signed into law by the governor.

For our purposes, the key words in the statute are "identity" and "sex change." *See* TEX. FAM. CODE ANN. § 2.005(a), (b)(8). "Identity" refers to the applicant as an individual, and the term "sex change" refers to the applicant changing his or her sex. *See id.* Reading the statutory provision as a whole, it states that an applicant who has had a "sex change" may use a court order related to that sex change as proof of identity and thus eligibility to obtain a marriage license. *See id*. Reading the statute to conform with the definition of a marriage in the Texas Constitution and the statutory ban on same sex marriages, which are crystal clear in their meaning and effect, we hold that under Texas law a valid marriage could exist between Nikki and Thomas only if Nikki was a woman during their marriage such that there was a marriage between one man and one woman, as set forth in the Texas Constitution. *See* TEX. CONST. art. I, § 32(a). Otherwise, it was a same sex marriage banned by Texas law. *See* TEX. FAM. CODE ANN. § 6.204(b).

In sum, we hold that Texas law recognizes that an individual who has had a "sex change" is eligible to marry a person of the opposite sex. *See id.* § 2.005(a), (b)(8). For these reasons, we conclude that the trial court's summary judgment in this case cannot be affirmed based on *Littleton* because *Littleton* has been legislatively overruled. *See id*.

18

## B. Is There a Fact Issue Precluding Summary Judgment?

In their respective motions, Heather and Simona argued that Nikki is a man based on the uncontroverted summary judgment evidence that she was born with male sex organs, had male sex organs at the time of her ceremonial marriage to Thomas, and was originally designated as "male" on her California birth certificate.

In response, Nikki objected to the evidence of her original birth certificate on the basis that it "is now a legal nullity" because the State of California subsequently issued a new birth certificate stating that she is "female," which Nikki produced as summary judgment evidence. Nikki also presented the expert report of Dr. Cole stating that "sexuality per se is a complex phenomenon which involves a number of underlying factors."[13] According to Dr. Cole's affidavit, the factors that "should be taken into account when identifying someone as male or female" "include chromosomes, hormones, sexual anatomy, gender identity, sexual orientation, and sexual expression." Dr. Cole notes that while sexual "anatomy" at birth is "typically" the basis for determining an individual's sex,

---

[13] Simona made several objections to the affidavit of Dr. Cole. On March 24, 2011, the trial court signed an order overruling all the objections. Simona has not appealed that ruling. However, in her appellate brief, she contends that this Court should exclude the affidavit of Dr. Cole from consideration because (1) the affidavit fails to state that "the facts contained herein are true" and (2) the documents referred to in the affidavit were not attached. In response to the first contention, Nikki requested and obtained an order from the trial court stating that Nikki "out of an abundance of caution, has revised the timely filed affidavit of Collier Cole, Ph.D. to state that 'the facts and opinions stated in this affidavit are within my personal knowledge, are true and correct . . .' at the onset of his affidavit." Attached to the order is Dr. Cole's affidavit stating that the facts are "true and correct." We also note that both affidavits (the original and revised) stated that the facts and opinions were within Dr. Cole's personal knowledge and both were subscribed to and sworn before a notary public. Accordingly, we will not exclude the affidavits from consideration on this basis. *See Fed. Fin. Co. v. Delgado*, 1 S.W.3d 181, 184 (Tex. App.—Corpus Christi 1999, no pet.) ("[W]here the affidavit does not specifically recite that the facts set forth there are true, but does set out that it is based on personal knowledge and is subscribed to and sworn before a notary public, it is not defective if, when considered in its entirety, its obvious effect is that the affiant is representing that the facts stated therein are true and correct."). In response to the second contention, we note that the revised affidavit by Dr. Cole, which the trial court permitted, had the documents referred to in the affidavit attached to the affidavit. *See* Tex. R. Civ. P. 166a(f) ("Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith."). Accordingly, we will not exclude the affidavit from consideration in this appeal.

"this is sometimes done incorrectly."

Dr. Cole's affidavit states in relevant part as follows:

With respect to gender dysphoria it is the factor of gender identity which is the primary focus. By definition gender identity is that personal private sense of being male or female. Of note, there also exist certain conditions where individuals may be born with chromosomal anomalies (such as XXY) or anatomical anomalies (such as intersex condition), in such cases it is recommended today that physicians not intervene until an individual is of age and has accepted clearly his or her gender identity. Then, as in the case of gender dysphoria, surgical and medical procedures can be brought to bear, to line up that person's body to fit the mind and thereby complete treatment and resolve the underlying issue.

Many individuals with gender dysphoria will recognize such themselves early in life and move forward with pursuing treatment intervention on their own. Others will go to professionals who can assist them in this regard. With increased awareness of this condition following the Christine Jorgenson case in 1952 many centers around the country began developing programs. However, it was not until 1980 that the Harry Benjamin International Gender Dysphoria Association was created and established the first Standards of Care, these are now in the sixth edition and can be found on the website of the World Professional Association for Transgender Health (WPATH.org). As in other areas of medicine once a condition becomes more understood protocols or standards are developed to assist people seeking help for a particular condition as well as to aid treating professionals working with them. In this case the major technique used to confirm a diagnosis of gender dysphoria is the "real life experience." Essentially this is a period of time, a minimum of one year, where the individual begins living in the desired gender role. It is during this period of time that an individual will undergo hormone therapy to become more male or female in appearance, will begin living and working in that gender role, will deal with family and relationships, and then move towards making legal changes in terms of one's name and gender designation on routine identification through the courts. After a successful transition an individual may pursue gender reassignment surgery to redesign the genitals in the desired fashion. . . .

Many individuals cannot afford surgery and so will continue to live without such. It should be noted that this does not make them any less gender dysphoric than someone who does complete surgery. It is completion of the real life experiences itself which marks the point of change. Afterwards the individual, either one who has had surgery or one [who] has not, can pursue legal steps to change the birth certificate in the desired direction. Overall this method of treatment (i.e., The Standards of Care) is recognized

and accepted by contemporary and medical entities (e.g., Texas Department of Health, the Endocrine Society of the U.S.).

After providing the foregoing explanation of gender dysphoria and the accepted standards of care for the condition, Dr. Cole offers the following information concerning Nikki:

> With respect to Nikki Araguz . . . I was provided a number of medical records to review before I interviewed her. These records dated back to the early 1990's and revealed much about her transition process. (A listing of these documents can be found in the attachment with this statement.) They suggest that Ms. Araguz had been following the aforementioned steps of the real life experience, including living as female, undergoing feminizing hormone therapy, and experiencing satisfying relationships with family and others. In addition to her records, I had a face-to-face interview with her in early January. She was born in Carmel, California, and raised primarily in Houston, Texas. From an early age she recalls longstanding feelings of being female, an observation often seen as noted above. Indeed, she reports wearing female clothes essentially all of her life. She often was perceived by others as female until they were corrected. This would suggest a strong female sexual identity.

> At age 18 her physician started her on feminizing hormone therapy. (No evidence of chromosome testing was reported.) From there she continued living as female in the real world. Her family was supportive of her gender dysphoria, she had both friendly and intimate relationships over the years, and she was successful in various work endeavors, where she always presented herself as female. At age 21 she successfully changed her name legally in the Houston courts. None of the records reviewed indicate any psychiatric problems related to her gender dysphoria or living as female. In my professional opinion she had successfully completed the "real life experience" in the late 1990's as described in the Standards of Care. She then began saving money to pursue sex reassignment surgery which was completed in October 2008. In summary, Ms. Araguz successfully completed the current medically-accepted steps for treating the condition of gender dysphoria as described above. She essentially had been living as a female from an early age. Then, she began seeing a physician to initiate her feminizing hormone therapy which remains ongoing at this time. Also, she successfully dealt with family members and others in her life and also worked in the real world as a female. Eventually she was fortunate to complete sex reassignment surgery. However, as noted above many such individuals do not complete surgery for financial reasons. Surgery per se is not the definitive point that makes someone female. Rather, it is completion of the real life experience which documents . . . [that] she had this condition

at birth, recognized such as she grew up, and took the steps to resolve this issue. And, she pursued the transition in accordance with The Standards of Care of the World Professional Association for Transgender Health; I regard her medically and psychologically as female.

We conclude that Dr. Cole's affidavit is sufficient to raise a fact issue regarding Nikki's sex. According to Dr. Cole, sexuality is a "complex phenomenon," particularly when a "person's body . . . [does not] fit the mind." The uncontroverted evidence established that Nikki suffers from a medical condition known as "gender dysphoria," discussed at length in Dr. Cole's affidavit, the symptoms, diagnosis, and treatment of which are "matters beyond the ken of most jurors" and jurists. *Alexander v. Turtur & Assocs., Inc.*, 146 S.W.3d 113, 119 (Tex. 2004). Because the issue is beyond our "common understanding, expert testimony is necessary." *Id*. at 119–20; *Haddock v. Arnspiger*, 793 S.W.2d 948, 954 (Tex. 1990) (holding, after reviewing the evidence, that an expert was needed because the nature of the case was beyond the "common knowledge of laymen"). We believe that "[e]xpert testimony is necessary . . . [because] the . . . [condition of gender dysphoria and its treatment are] of such a nature as not to be within the experience of the layman." *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982). Similar to when the Texas Supreme Court held that "the diagnosis of skull fractures is not within the experience of the ordinary layman," *see id*., we hold that the condition of gender dysphoria—including its symptoms, diagnosis, and treatment—are issues of fact not within our common knowledge and therefore require expert testimony. *See Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 904–05 (Tex. 2004) ("The answer is not within common knowledge and requires expert testimony.").

The only expert testimony in the summary judgment record is Dr. Cole's affidavit. Heather and Simona failed to submit any expert testimony in support of their motions.

Although their evidence established that Nikki was born with male sex organs and had male sex organs on the date of her ceremonial marriage to Thomas, there is no evidence to controvert Dr. Cole's expert testimony regarding Nikki's medical condition (i.e., gender dysphoria), its treatment, or his expert opinion that Nikki is "medically and psychologically" female as a result of her compliance with the standards of care adopted by the World Professional Association for Transgender Health. Dr. Cole's expert testimony accounts for Nikki's male sex organs at birth and at the time of her ceremonial marriage to Thomas, which are uncontroverted facts that cannot be disregarded, and places them in context such that a reasonable juror crediting Dr. Cole's testimony would be able to find Nikki's sex to be female. Accordingly, we conclude that Nikki raised a genuine issue of material fact regarding her sex. *See* TEX. R. CIV. P. 166a(c).

## C. Was Summary Judgment Proper Based on Judicial Estoppel?

The only remaining basis for upholding the trial court's summary judgment is Simona's assertion of judicial estoppel. "The doctrine of judicial estoppel precludes a party from adopting a position inconsistent with one that it maintained successfully in an earlier proceeding." *Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 6 (Tex. 2008). In response to Simona's motion for summary judgment, Nikki argued that Simona had not pled judicial estoppel and therefore could not assert it for the first time in her motion for summary judgment. *See* TEX. R. CIV. P. 94 (listing "estoppel" as an affirmative defense that must be specifically pled). We agree. Accordingly, we conclude that the trial court could not have properly granted summary judgment based on Simona's assertion of judicial estoppel.

23

## D. Is Nikki Entitled to Rendition of Judgment?

Finally, Nikki requests that we render a judgment in her favor; however, we deny the request because Nikki's no evidence motion for summary judgment does not support rendition of a judgment. See TEX. R. CIV. P. 166a(i). In reaching this conclusion, we have considered only the evidence that Heather and Simona produced in response to Nikki's no evidence motion for summary judgment. *See id.* As noted above, Nikki's motion was in form and substance a no evidence motion for summary judgment. *See id.* It did not reference any evidence, such as Dr. Cole's report, which was attached only to Nikki's response to Heather and Simona's traditional motions for summary judgment. Therefore, the issue on appeal is whether Heather and Simona produced some evidence sufficient to raise a genuine issue of material fact as to Nikki's sex being male. *See Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013) ("No-evidence summary judgments are reviewed under the same legal sufficiency standard as directed verdicts.").

As set forth above, the summary judgment evidence produced by Heather and Simona does not include any expert testimony. Although we have concluded that the expert testimony offered by Nikki was sufficient to defeat Heather and Simona's traditional motions for summary judgment and expressed our belief that expert testimony is necessary regarding the symptoms, diagnosis, and treatment of gender dysphoria, the issue here is simply whether Heather and Simona produced some evidence to raise a fact issue about Nikki being male during the marriage. *See Western Investments, Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005) ("Unless the respondent produces summary judgment evidence raising a genuine issue of material fact, the court must grant the motion."). Heather and Simona's evidence showed that Nikki had male sex organs during

the marriage. In our view, this was enough to raise a fact issue about whether Nikki was male during the marriage because a rational trier of fact could draw a reasonable inference that Nikki was male based on her male sex organs. This inference could be drawn without the assistance of expert testimony. Accordingly, the evidence was sufficient to defeat Nikki's no evidence motion for summary judgment. *See* TEX. R. CIV. P. 166a(i). We conclude that the trial court properly denied Nikki's motion.

## VII. CONCLUSION

For the reasons set forth above, we sustain Nikki's first, fifth, and sixth issues challenging the trial court's summary judgment in favor of Heather and Simona. Specifically, we sustain Nikki's first issue because Nikki produced sufficient evidence to raise a genuine issue of material fact with regard to her sex. We sustain Nikki's fifth issue because we conclude that *Littleton* is not controlling because it was subsequently overruled by the legislature. We sustain Nikki's sixth issue because summary judgment cannot be upheld based on judicial estoppel. Although Nikki requests that we render a judgment in her favor based on these issues, we conclude that such relief is inappropriate because (1) a genuine issue of material fact exists with regard to Nikki's sex and (2) Heather and Simona produced sufficient evidence to overcome Nikki's no evidence motion for summary judgment. Accordingly, we render the judgment the trial court should have rendered, which is a judgment denying Nikki, Heather, and Simona's motions for summary judgment. *See Mann Frankfort Stein & Lipp Advisors, Inc.*, 289 S.W.3d at 848.

We do not reach Nikki's second, third, or fourth issues because the issues would not entitle Nikki to any additional relief beyond reversal of the trial court's summary judgment. *See* TEX. R. APP. P. 47.1. Finally, because we conclude that there is a genuine

25

issue of material fact regarding Nikki's sex, we do not reach Nikki's seventh issue challenging the constitutionality of the Texas ban on same sex marriages.  *See* TEX. R. CIV. P. 166a(c); TEX. R. APP. P. 47.1.

We reverse the trial court's judgment and remand the case for further proceedings consistent with this opinion.

_____
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
13th day of February, 2014.