

KEN PAXTON

ATTORNEY GENERAL OF TEXAS

March 14, 2025

Colonel Freeman F. Martin
Director
Texas Department of Public Safety
Post Office Box 4087
Austin, Texas 78773-0001

**Opinion No. KP-0489**

Re: Validity of district court orders directing state agencies to amend a person's biological "sex" designation on state identification documents (RQ-0563-KP)

Director Martin:[1]

Your inquiry relates to the validity of district court orders directing the Department of Public Safety ("DPS") and the Department of State Health Services ("DSHS") to amend a person's biological sex on government-issued documents. Request Letter at 1. For context, you explain that district courts across Texas have issued "orders" requiring that these state agencies—who are not notified of, named in, or joined to the underlying proceedings—alter "the gender and sex identifiers on any and all licenses, certificates, or other official documents under the agenc[ies'] control." *Id.* at 2 (referencing orders in Travis County); *see also, e.g.*, *id.* at 3 (noting similar orders in Dallas County). You also indicate that DPS "may have altered . . . government sex records" to comply with these orders, *id.* at 4, which are based on petitioners' representation that their "birth certificate and other identifying information should conform with [their] true gender/sex," *id.* at 2 (citation omitted).

Ultimately, you ask whether "Texas courts have the authority to render judgments in uncontested proceedings that order a non-party to change a person's 'sex' . . . on government documents," and, if not, whether affected agencies can correct prior, court-ordered changes that "were inconsistent with state law." *Id.* at 1, 4. Though you also ask "[w]hat constitutes satisfactory proof of an inaccurate or incomplete 'sex' designation," *id.* at 1, we address that point as it pertains to your second question.

---

[1] While this opinion was first requested by former Director McCraw, Letter from Mr. Steven McCraw, Dir., Tex. Dep't of Pub. Safety, to Hon. Ken Paxton, Tex. Att'y Gen. at 1 (Sept. 13, 2024), www.texasattorneygeneral.gov/ sites/default/files/request-files/request/2024/RQ0563KP.pdf ("Request Letter"), Director Martin has since assumed office and, on January 8, 2025, asked that we keep the request open. E-mail from D. Phillip Adkins, Gen. Couns., Tex. Dep't of Pub. Safety, to Off. of Tex. Att'y Gen., Op. Comm. at 1 (Jan. 8, 2025) (on file with the Op. Comm.). We granted that request on January 9, 2025, and proceed accordingly.

## I.     District courts lack jurisdiction to issue ex parte sex-change orders

We begin with the classic foundation of judicial authority: jurisdiction. "The very balance of state governmental power imposed by the framers of the Texas Constitution depends on each branch, and particularly the judiciary, operating within its jurisdictional bounds." *Brown v. De La Cruz*, 156 S.W.3d 560, 569 (Tex. 2004) (citation omitted). In fact, "the only real power a court possesses—the power of judgment—cannot be exercised without jurisdiction." *Dickson v. Am. Gen. Life Ins. Co.*, 698 S.W.3d 234, 238 (Tex. 2024) (Young, J., concurring in denial of the petition for review) (collecting cases). Over a century of precedent confirms the same. *See, e.g.*, *Tex. & P. Ry. Co. v. Gay*, 26 S.W. 599, 601 (Tex. 1894), *aff'd*, 167 U.S. 745 (1897) (explaining "[j]urisdiction must depend on the laws creating the court and prescribing its powers, and, if it attempts to exercise a power not thus conferred, its judgments and decrees are not binding"); *Withers v. Patterson*, 27 Tex. 491, 492 (1864) ("Orders and judgments [for] which [a] court has not the power[] . . . to make or render[] are, of course, null[] . . . .").

But the term "jurisdiction" has long endured "too many[] meanings."[2] *In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 305 (Tex. 2010) (citation omitted). Framed simply, jurisdiction reduces to a court's constitutional share of "the judicial power," which allows judicial officers "to decide," "pronounce," and "carry . . . into effect [judgments] between persons and parties who bring a case . . . for a decision." *Morrow v. Corbin*, 62 S.W.2d 641, 644–45 (Tex. 1933); *accord In re Off. Att'y Gen.*, 702 S.W.3d at 366 (reaffirming this definition). It follows that a court cannot "address the merits" of any action without (A) authority to entertain the class of case—*i.e.*, "jurisdiction over the subject matter," (B) the valid invocation of that authority—*i.e.*, "jurisdiction over the party," *and* (C) authority to afford relief—*i.e.*, "jurisdiction to enter the particular judgment." *State Bar of Tex. v. Gomez*, 891 S.W.2d 243, 245 (Tex. 1994). Failing any one of these requirements, the resulting "judgment is void[] rather than voidable." *In re D.S.*, 602 S.W.3d 504, 512 (Tex. 2020); *PNS Stores, Inc. v. Rivera*, 379 S.W.3d 267, 272 (Tex. 2012) (same).

We therefore analyze the orders you describe through this three-part jurisdictional lens.

### A.  Jurisdiction over the Subject Matter

Three foundational limits on district courts' subject-matter jurisdiction prove relevant to your request. First, "[i]t is well settled that trial courts may review an administrative action *only if* a statute provides a right to judicial review[] or the action adversely affects a vested property right or otherwise violates a constitutional right." *In re Off. Att'y Gen.*, 456 S.W.3d at 157 (emphasis added); *Stone v. Tex. Liquor Control Bd.*, 417 S.W.2d 385, 385–86 (Tex. 1967) (same); *City of Amarillo v. Hancock*, 239 S.W.2d 788, 790 (Tex. 1951) (same). This is why exhaustion of administrative remedies—a jurisdictional prerequisite where an agency possesses exclusive jurisdiction—is said to be "of no consequence" where the governing framework "is . . . silent on

---

[2] With this in mind, the Supreme Court of Texas has undertaken recent efforts to clarify that judicial authority is not shaped by the political importance of a question, *Morath v. Lewis*, 601 S.W.3d 785, 789 (Tex. 2020) (per curiam); a putative distinction between common-law versus statutory causes of action, *Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 75–76 (Tex. 2000); the independent validity of a holding, *In re Tex. House of Representatives*, 702 S.W.3d 330, 336–37 (Tex. 2024); or fidelity to the perceived purpose of a statutory text, *In re Off. of the Att'y Gen.*, 702 S.W.3d 360, 366 (Tex. 2024) (per curiam).

the question of appeal." *Hous. Mun. Emps. Pension Sys. v. Ferrell*, 248 S.W.3d 151, 157–58 (Tex. 2007). Indeed, "[n]o principle is more firmly established[] than that where . . . exclusive authority[] is delegated to any . . . officer of the government, and no mode of revising his decision[] by appeal or otherwise[] is provided by law, his [discretionary] action is final and conclusive." *Keenan v. Perry*, 24 Tex. 253, 260 (1859). This settled precept "was added to the Texas Constitution" in Article V, section 8, which "gives district courts general jurisdiction 'except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court, tribunal, or administrative body.'"[3] *Morath v. Sterling City Indep. Sch. Dist.*, 499 S.W.3d 407, 412 & n.25 (Tex. 2016) (quoting TEX. CONST. art. V, § 8).

A second, independent constraint on subject-matter jurisdiction resides in sovereign immunity. Non-consensual suits against the state government lay beyond the settled scope of "judicial power" that preceded the Texas Constitution's adoption in 1876. *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999) (per curiam) (tracing this prohibition to 1847); *see also, e.g.*, *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004) (explaining that "sovereign immunity deprives a trial court of . . . jurisdiction"). Suits against a state agency thus require express legislative consent—like that found in the Administrative Procedure Act or the Uniform Declaratory Judgments Act—to raise an administrative controversy upon which the judiciary can weigh. *See, e.g.*, *Tex. Dep't of Protective & Regul. Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 198 (Tex. 2004) (discussing the APA); *Tex. Educ. Agency v. Leeper*, 893 S.W.2d 432, 446 (Tex. 1994) (discussing the UDJA). To be sure, "Texas courts likewise recognize that an action . . . against a state official who has acted *ultra vires*—that is, without legal or statutory authority—is not a suit against the State that sovereign immunity bars." *Phillips v. McNeill*, 635 S.W.3d 620, 628 (Tex. 2021). But a plaintiff must "allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act" to invoke this exception to sovereign immunity. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009).

Justiciability represents a third, independent limit on district courts' subject-matter jurisdiction. "The constitutional roots of justiciability doctrines . . . lie in the prohibition on advisory opinions[] . . . ." *Patterson v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 971 S.W.2d 439, 442 (Tex. 1998); *accord Bienati v. Cloister Holdings, LLC*, 691 S.W.3d 493, 498 (Tex. 2024) (per curiam). Yet it is "our separation of powers article, TEX. CONST. art. II, § 1, [that] prohibits courts from . . . decid[ing] abstract questions of law without binding the parties." *Brown v. Todd*, 53 S.W.3d 297, 302 (Tex. 2001); *see also, e.g.*, *Coalson v. City Council of Victoria*, 610 S.W.2d 744, 747 (Tex. 1980) ("District courts, under our Constitution, do not give advice nor decide cases upon speculative, hypothetical, or contingent situations."). This article "underscores the structural limits that inhere in our Constitution no less than in [its] federal counterpart," *In re House*, 702 S.W.3d at 342–43, and commands that no department "shall exercise any power properly attached to . . . the others," TEX. CONST. art. II, § 1. Consequently, "the judicial power does not embrace . . . advisory opinions" because that authority "is vested in the executive branch." *Firemen's Ins.*

---

[3] Previously, this section of the Texas Constitution enumerated various categories of district court jurisdiction—including "original jurisdiction over all causes of action whatever for which a remedy or jurisdiction is not provided by law or this Constitution, and such other jurisdiction[] . . . as may be provided by law." Tex. S.J. Res. 14, § 4, 69th Leg., R.S., 1985 Tex. Gen. Laws 3355, 3358.

*Co. v. Burch*, 442 S.W.2d 331, 333 (Tex. 1968) (collecting cases); *accord Gen. Land Off. v. OXY U.S.A., Inc.*, 789 S.W.2d 569, 570 (Tex. 1990); *Morrow*, 62 S.W.2d at 643–44.

As explained below, however, each of these limits belie the exercise you describe—meaning the resulting orders are "void." *D.S.*, 602 S.W.3d at 512; *PNS Stores*, 379 S.W.3d at 272.

## 1. Judicial Review of Administrative Actions

The statutory frameworks governing driver's licenses and birth certificates do not contemplate judicial review over amendments to either form of government identification. Chapter 521 of the Texas Transportation Code, for example, details all aspects of driver's licenses—ranging from the uniform content and appearance requirements to applications, issuance, denials, suspensions, and revocations. TEX. TRANSP. CODE §§ 521.121–.127, .141–.148, .181–.183, .291–.320 (addressing these topics in respective order). Much of this rubric has remained substantively unchanged since driver's licenses were first introduced to Texas in 1936: Applicants must still "apply in a manner prescribed by the department," *id.* § 521.141(a); *accord* TEX. REV. CIV. STAT. art. 6687a, § 5(a) (Vernon's 1936); those applications must still include an applicant's name, birthplace, birthdate, and "sex," TEX. TRANSP. CODE § 521.142(a), (c)(1); *accord* TEX. REV. CIV. STAT. art. 6687a, § 5(b) (Vernon's 1936); and the ensuing license must still include a unique number as well as the licensee's name, age, description, and address, TEX. TRANSP. CODE § 521.121(a)(1)–(5); *accord* TEX. REV. CIV. STAT. art. 6687a, § 8(b) (Vernon's 1936); *see also* 37 TEX. ADMIN. CODE § 15.26(4) (refining "description" to include a person's "sex"). Likewise, the discretion to issue corrected licenses—as well as the quantum of proof necessary to support the same—has been committed to the exclusive discretion of DPS since 1968.[4] TEX. TRANSP. CODE § 521.146(b) (requiring "proof *satisfactory to the department* that supports the change" (emphasis added)); TEX. REV. CIV. STAT. art. 6687b, §§ 14, 20 (Vernon's 1974) (same); TEX. REV. CIV. STAT. art. 6687b, § 14 (Vernon's 1968) (same).

This stands in sharp contrast to the Legislature's consistent provision of judicial review over administrative actions like suspensions and revocations—categories over which county courts alone have possessed jurisdiction since the framework's inception. TEX. TRANSP. CODE § 521.308(a)–(b) (providing for county court appeals of sustained license suspensions or revocations); *accord* TEX. REV. CIV. STAT. art. 6687a, § 17 (Vernon's 1936) (allowing "[a]ny person denied a license by the Department" to petition county courts for review);[5] *see also, e.g.*, TEX. TRANSP. CODE § 524.041(a)–(b) (providing for county court review of sustained,

---

[4] Before then, DPS could issue "a duplicate or substitute" license if "lost or destroyed." TEX. REV. CIV. STAT. art. 6687a, § 9 (Vernon's 1936); *accord* TEX. REV. CIV. STAT. art. 6687b, § 14 (Vernon's 1942) (same). Yet even that discretion was invested in DPS alone—requiring an individual to "furnish[] proof satisfactory *to the Department*." TEX. REV. CIV. STAT. art. 6687a, § 9 (Vernon's 1936) (emphasis added). That same standard exists today.

[5] Though the controlling statutes from 1938 to 1959 allowed county court appeals over a broader range of departmental action—contemplating petitions for judicial review when a license was "denied," "cancelled, suspended, or revoked by the Department," TEX. REV. CIV. STAT. art. 6687a, § 17 (Vernon's 1938); *accord* TEX. REV. CIV. STAT. art. 6687b, § 31 (Vernon's 1948) (same)—we need not outline the presumptive breadth of these categories because they were condensed to focus on suspensions, alone, eight years *before* the Legislature provided DPS with statutory authority to issue corrected licenses. *Compare* TEX. REV. CIV. STAT. art. 6687b, § 22(c) (Vernon's 1960) (specifying appealable suspensions), *with* TEX. REV. CIV. STAT. art. 6687b, § 14 (Vernon's 1968) (governing corrected licenses).

intoxication-based suspensions); *id.* § 601.401(a)–(b) (same, suspensions under the Texas Motor Vehicle Safety-Responsibility Act); *cf. also, e.g.*, *id.* § 524.041(b) (permitting motion-based transfers to district courts "[i]f the county judge is not a licensed attorney").

Birth certificates are no different. Chapter 191 of the Health and Safety Code empowers DSHS to "administer the registration of vital statistics" and directs the agency to "establish a vital statistics unit . . . for the preservation of *its official records*," "establish a statewide system of vital statistics," "provide instructions and prescribe forms" for the entire process of "preserving vital statistics," and "require the enforcement" of associated statutes and rules. TEX. HEALTH & SAFETY CODE § 191.002(a)–(b) (emphasis added). This chapter also mandates that DSHS "shall prescribe the form and contents of . . . birth certificate[s]," *id.* § 192.002(a); *accord* 25 TEX. ADMIN. CODE § 181.13(a) (same, explaining the requisite "items will be designated on department forms"), and specifies that "[a] record of birth[] . . . may not be changed except" where "incomplete or proved by satisfactory evidence to be inaccurate," TEX. HEALTH & SAFETY CODE § 191.028(a)–(b) (noting that "amendment[s] must be in a form prescribed by the department").

Yet this centralized framework is nothing new. For the last century, DSHS has been singlehandedly charged with ensuring "uniform observance . . . and . . . maintenance of a perfect system of registration." TEX. HEALTH & SAFETY CODE § 191.004(b) (detailing the State Registrar's duties and obligations); *accord* TEX. REV. CIV. STAT. art. 4553a, R. 48 (Vernon's 1914) (same); *see also, e.g.*, TEX. REV. CIV. STAT. art. 4477, R. 56 (Vernon's 1925) ("No system for the registration of births and deaths shall be continued or maintained in any city or county of this State other than the system provided for and prescribed by . . . this Chapter."). Among these unchanged mandates is DSHS's obligation to "carefully examine the certificates received" and, "if necessary," to "require additional information to make the record complete and satisfactory." TEX. HEALTH & SAFETY CODE § 191.031(a)–(b); *accord* TEX. REV. CIV. STAT. art. 4553a, R. 48 (Vernon's 1914) (same). It was not until 1984 that this framework first included a "judicial procedure to establish facts of birth," which vested county-level jurisdiction over DSHS's refusal to *register* a delayed birth certificate. TEX. REV. CIV. STAT. art. 4477, R. 51a, § B.6 & C (Vernon's 1984); *see also* TEX. HEALTH & SAFETY CODE § 192.027(a) (same, allowing review in statutory probate or district courts). The Legislature did not, however, provide similarly for the contents of birth certificates.

We must ultimately "presume that the Legislature chooses a statute's language with care," *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011), and "[w]hen the Legislature includes a right or remedy in one part of a code but omits it in another, . . . 'we must honor that difference,'" *City of DeSoto v. White*, 288 S.W.3d 389, 396 (Tex. 2009) (alteration in original) (citation omitted). To honor that difference here is to conclude the district courts described in your request "lacked authority to order [DPS or DSHS] to [amend] . . . its files" because there is no "authority expressly providing for . . . [such] review." *In re Off. Att'y Gen.*, 456 S.W.3d at 157; *see also, e.g.*, *Hous. Mun. Emps.*, 248 S.W.3d at 157–58; *Stone*, 417 S.W.2d at 385–86; *Hancock*, 239 S.W.2d at 790. Neither the Transportation Code nor the Health and Safety Code contemplate judicial review over the contents of driver's licenses or birth certificates—unlike administrative actions that carry notice and hearing requirements, *e.g.*, TEX. TRANSP. CODE §§ 524.040–.041 (administrative suspensions of driver's licenses); TEX. HEALTH & SAFETY CODE § 191.057(c) (refusal to issue certified copies of birth certificates)—as has been true since the Legislature established both frameworks.

It is of no moment that "[t]he right to challenge administrative actions . . . on the basis that such actions unconstitutionally deprive the plaintiff of a vested property right is a right to judicial review distinctly different from [one] . . . given by a statute." *Cont'l Cas. Ins. Co. v. Functional Restoration Assocs.*, 19 S.W.3d 393, 404 (Tex. 2000). This only proves relevant "[w]hen a vested property right has been adversely affected by the action of an administrative body *so as to invoke* the protection of due process."[6] *Brazosport Sav. & Loan Ass'n v. Am. Sav. & Loan Ass'n*, 342 S.W.2d 747, 750 (Tex. 1961) (emphasis added); *accord Hous. Mun. Emps.*, 248 S.W.3d at 157–58 (rejecting a "right to judicial review of an administrative order unless a statute explicitly provides that right or the order violates a constitutional right"); *Hancock*, 239 S.W.2d at 790 (same, vested property right); *see also, e.g.*, *Firemen's & Policemen's Civ. Serv. Comm'n v. Kennedy*, 514 S.W.2d 237, 239 (Tex. 1974); *Chem. Bank & Tr. Co. v. Falkner*, 369 S.W.2d 427, 433 (Tex. 1963). But there is no vested property right in the *contents* of either Texas driver's licenses or birth certificates. *See, e.g.*, *Tex. Dep't of Pub. Safety v. Schaejbe*, 687 S.W.2d 727, 728 (Tex. 1985) (explaining driver's licenses are "not a [legal] right[] but a privilege"); *Gillaspie v. Dep't of Pub. Safety*, 259 S.W.2d 177, 183 (Tex. 1953) (same); *see also, e.g.*, *Adar v. Smith*, 639 F.3d 146, 158–59 (5th Cir. 2011) (en banc) (rejecting claim "that the full faith and credit clause entitles [a person] to a revised birth certificate"). Generally, a cognizable property interest requires "more than a unilateral expectation." *Wigginton v. Jones*, 964 F.3d 329, 336 (5th Cir. 2020) (citation omitted); *see also, e.g.*, *Gore v. Lee*, 107 F.4th 548, 557–58 (6th Cir. 2024) (explaining "the [U.S.] Constitution does not require the States to embrace the plaintiffs' view of what information a birth certificate must record"); *Brown v. Cooke*, No. 06-CV-01092-MSK-CBS, 2009 WL 641301, at *6 (D. Colo. Mar. 9, 2009) (same, driver's licenses), *aff'd*, 362 F. App'x 897 (10th Cir. 2010).

## 2. Sovereign Immunity

Sovereign immunity also betrays subject-matter jurisdiction on the facts you describe. As a "general rule[,] . . . the plaintiff's petition must state facts which affirmatively show the jurisdiction of the court." *United Servs. Auto. Ass'n v. Brite*, 215 S.W.3d 400, 402 (Tex. 2007) (quoting *Richardson v. First Nat'l Life Ins. Co.*, 419 S.W.2d 836, 839 (Tex. 1967)). Consequently, suits against "[a] unit of state government" obligate a plaintiff to "alleg[e] a valid waiver of immunity." *Dall. Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003).

It appears the district courts you reference have incorrectly concluded otherwise. The petition available in Travis County, for example, calls upon a single statute in the "Request for Judgment" section—stating "upon application to the Vital Statistics Unit my Texas birth certificate

---

[6] Neither does it matter that dictum later broadened the description of an "inherent constitutional right to judicial review" as if resulting either from "administrative decisions . . . [that] adversely affect a vested property right or otherwise violate some [constitutional] provision." *Cont'l Cas. Ins.*, 19 S.W.3d at 404; *accord In re Off. Att'y Gen.*, 456 S.W.3d at 157. Administrative action precedes either putative path to review. Yet here, the petitions you describe circumvent the state agencies altogether and do not take issue with *any* administrative action. *See infra* pp. 9–11 (discussing the ensuing justiciability problem). We therefore undertake no discussion of whether it is appropriate to "assume jurisdiction . . . in order that the administrative body may function," *Hancock*, 239 S.W.2d at 790–91—despite the categorical impropriety of assuming jurisdiction. *See Fin. Comm'n of Tex. v. Norwood*, 418 S.W.3d 566, 578 (Tex. 2013) (rejecting hypothetical jurisdiction); *see also, e.g.*, *Dickson*, 698 S.W.3d at 238 (Young, J., concurring in denial of the petition for review) (describing hypothetical jurisdiction as constitutionally "incoherent").

shall be amended pursuant to Texas Health and Safety Code 192.011 to reflect my sex/gender." *Petition to Change Gender and Sex Identifier of an Adult* ("Travis County Petition") at 3 (Rev. June 2019), https://tinyurl.com/Travis-County-Sample (last visited Feb. 19, 2025). The petition from Dallas County additionally invokes "Section 45.102 of the Texas Family Code" alongside "Section 192.028 of the Texas Health and Safety Code." *Original Petition for Change of Name of Adult with Gender Marker Correction/Sex on Birth Certificate* ("Dallas County Petition") at 1, https://tinyurl.com/Dallas-County-Sample (last visited Feb. 19, 2025). But "[s]overeign immunity [can] not be avoided merely through . . . insistence on styling [a] suit as an 'ex parte' proceeding." *Ex parte Springsteen*, 506 S.W.3d 789, 802 (Tex. App.—Austin 2016, pet. denied); *accord In re Thompson*, 330 S.W.3d 411, 416 (Tex. App.—Austin 2010, orig. proceeding) (observing the UDJA "does not contemplate *ex parte* proceedings"). At bottom, neither of these petitions even purports to invoke an express waiver of immunity.

Nor could they. Again, the Transportation Code as well as the Health and Safety Code contain no provision for judicial review over the contents of driver's licenses or birth certificates— a matter long committed to DPS and DSHS, respectively. *See supra* pp. 4–5 (detailing both frameworks). Texas courts have likewise rejected the notion that the Family Code provides any authority for a "court to . . . change [an individual's] gender designation." *In re Rocher*, No. 14-15-00462-CV, 2016 WL 4131626, at *2 (Tex. App.—Houston [14th Dist.] Aug. 2, 2016, no pet.) (mem. op.). "[U]nlike a name change, which is governed by Chapter 45 of the Texas Family Code, there is no corresponding chapter of the [F]amily [C]ode governing a sex change."[7] *In re Estate of Araguz*, 443 S.W.3d 233, 245 (Tex. App.—Corpus Christi 2014, pet. denied); *accord In re McReynolds*, 502 S.W.3d 884, 891 (Tex. App.—Dallas 2016, no pet.) (confirming that the Family Code "does not authorize Texas courts to render sex change orders").

Second, these petitions cannot be read to implicitly invoke a recognized waiver of sovereign immunity like that in the APA or UDJA. Both frameworks mandate that a state agency be made party to the underlying suit, TEX. GOV'T CODE § 2001.038(c) (APA); TEX. CIV. PRAC. & REM. CODE § 37.006(a) (UDJA), and the APA requires that suits be filed in Travis County alone, TEX. GOV'T CODE § 2001.038(b). *See generally Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 511 (Tex. 2012) (discussing TEX. GOV'T CODE § 311.034, which made "notice requirements, and all other statutory prerequisites to suit, jurisdictional as to governmental entities"). Neither could a petitioner invoke either waiver of sovereign immunity without "challenging the validity of a statute" or "the validity or applicability of any agency rule." *Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 622 (Tex. 2011) (per curiam) (addressing the UDJA and APA, respectively); *accord*

---

[7] Of course, the name-change rubric does not require a waiver of sovereign immunity because it does not pertain to administrative action and invites no judgment against the state government; these statutes instead "provide a method for recording the change" as a supplement to "the common law rule [that] allows a person to change his name without resort to legal procedure." *Appeal of Evetts*, 392 S.W.2d 781, 783 (Tex. App.—San Antonio 1965, writ ref'd) (discussing history of the common-law right); *see also, e.g.*, *Ex parte Smith*, 476 S.W.2d 29, 30 (Tex. App.—Houston [1st Dist.] 1972, no writ) (observing "there is no opposing party in a case of this nature"). This distinguishes the corollary question as to whether a name change *must* be recognized by the government. *See, e.g.*, *Brown*, 2009 WL 641301, at *5 (observing "a considerable body of caselaw recognizes that the Government is under no obligation to conform its own records to acknowledge an individual's decision to change his name"). That topic is beyond the scope of this opinion, however, and we observe only that a *name* change is not a *sex* change.

TEX. GOV'T CODE § 2001.038(a) (limiting scope of declaratory judgments under the APA); TEX. CIV. PRAC. & REM. CODE § 37.004(a) (defining subject matter of relief under the UDJA).

Yet the petitions you reference name no agency defendants and at least one, by its very nature, contemplates suit outside of Travis County. In substance, too, these petitions articulate no challenges through which sovereign immunity could be waived under the APA or UDJA: Neither challenges DPS's statutory mandate that driver's licenses "contain the same type of information" and "may not include any information" beyond that detailed in statute, TEX. TRANSP. CODE § 521.121(e)(1)(C), (e)(2); DPS's rule mandating that the "description" information include "sex" rather than gender, 37 TEX. ADMIN. CODE § 15.26(4); or the need to provide DPS with "proof satisfactory to . . . support[] [a] change," TEX. TRANSP. CODE § 521.146(b). These petitions also contain no challenge to the statutory mandate that DSHS "shall prescribe the form and contents of . . . birth certificate[s]," TEX. HEALTH & SAFETY CODE § 192.002(a); DSHS's statutory discretion to determine what records are "incomplete or proved by satisfactory evidence to be inaccurate," *id.* § 191.028(a)–(b); or DSHS's rule providing that "[t]he State Registrar shall determine the items of information to be contained on certificates of birth," 25 TEX. ADMIN. CODE § 181.13(a).

Third, the petitions you reference do not affirmatively allege ultra vires conduct that could obviate the foregoing. "Plaintiffs who seek to bypass sovereign immunity using an ultra vires claim must plead, and ultimately prove, that the defendant government official 'acted without legal authority or failed to perform a ministerial act." *Matzen v. McLane*, 659 S.W.3d 381, 388 (Tex. 2021) (quoting *Heinrich*, 284 S.W.3d at 372). This exception "depend[s] on the scope of the state official's authority" and "not the quality of the official's decisions," which is why "it is not [enough] . . . for an official to make an erroneous decision within the [discretionary] authority granted." *Honors Acad., Inc. v. Tex. Educ. Agency*, 555 S.W.3d 54, 68 (Tex. 2018) (citation omitted). Put differently, "*ultra vires* suits do not attempt to exert control over the state—they attempt to reassert [that] control," *Heinrich*, 284 S.W.3d at 372—and "can only . . . compel [a state official] to *follow* his governing authority, not . . . change [it]." *Hall v. McRaven*, 508 S.W.3d 232, 240 (Tex. 2017). "To reassert such control," however, "an *ultra vires* suit must lie against the 'allegedly responsible government actor in his official capacity.'" *Id.* (citation omitted); *see also, e.g.*, *Sefzik*, 355 S.W.3d at 621–22 (rejecting claim that failed to name "any state official").

These petitions pursue no such end. Instead, they highlight the perceived consequences of a district court's refusal to grant original relief—untethered from an alleged administrative act, omission, or legal obligation—and name no official-capacity defendants. Travis County Petition at 1; Dallas County Petition at 2. Of course, to name an agency official would serve only to highlight *why* the ultra vires exception cannot apply in this context: The authority to amend the contents of driver's licenses and birth certificates is a matter of discretion, respectively committed to DPS and DSHS alone. *See supra* pp. 4–5 (detailing both statutory frameworks, which require agency applications and "satisfactory" proof). Texas courts of appeals to confront identically "broad delegations of power" have correctly concluded that the ultra vires exception is inapplicable. *Tex. Dep't of Pub. Safety v. Salazar*, No. 03-11-00478-CV, 2013 WL 5878905, at *11–12 (Tex. App.—Austin Oct. 31, 2013, pet. denied) (mem. op.) (reversing for want of jurisdiction over DPS's discretion to demand "satisfactory" proof under the Transportation Code); *see also, e.g.*, *Bacon v. Tex. Hist. Comm'n*, 411 S.W.3d 161, 178–80 (Tex. App.—Austin 2013, no pet.) (affirming lack of jurisdiction over unsuccessful petitions to rename a Texas landmark).

Just as sovereign immunity will not yield to the phrase "ex parte" alone, *Springsteen*, 506 S.W.3d at 802, an ultra vires claim cannot lie against "the state agency itself," *Sefzik*, 355 S.W.3d at 621–22; *accord Matzen*, 659 S.W.3d at 388. These petitions therefore openly invite district courts to "exert control over the state" rather than "reassert control" over one of its agents. *Contra Hall*, 508 S.W.3d at 238 (citation omitted).

### 3. Justiciability

The failure to allege a justiciable controversy reveals yet another bar to subject-matter jurisdiction. It is axiomatic that "[d]istrict courts, under our Constitution, do not give advice nor decide cases upon speculative, hypothetical or contingent situations." *Coalson*, 610 S.W.2d at 747. "Justiciability doctrines like standing" serve to "ensure that courts do not issue advisory opinions," *Bienati*, 691 S.W.3d at 498, whose "distinctive feature" involves "decid[ing] an abstract question of law without binding the parties," *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993). Standing thus "limits subject matter jurisdiction to cases involving a distinct injury to the plaintiff and 'a real controversy between the parties, which . . . will be actually determined by the judicial declaration sought.'" *Neeley v. W. Orange-Cove Consol. Indep. Sch. Dist.*, 176 S.W.3d 746, 774 (Tex. 2005) (omission in original) (quoting *Brown v. Todd*, 53 S.W.3d 297, 305 (Tex. 2001)). Unlike sovereign immunity, however, standing does "not [involve] the viability *of* the pleaded claim but the nature of the injury alleged *in* that pleading—looking "to matters such as injury, causation, and redressability." *Perez v. Turner*, 653 S.W.3d 191, 198 (Tex. 2022) (emphasis added). Absent these elements, "[a] trial court has no more jurisdiction to deny [the plaintiff's] claims than it does to grant them." *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304 (Tex. 2008).

The petitions you highlight fail each facet of this rubric. First, none alleges a cognizable injury in fact. The petitions invoke little more than a perceived disparity between a petitioner's present "sex/gender" and that listed on their driver's license or birth certificate, based on the statutory procedures that expressly reflect DPS's and DSHS's authority over those documents. Travis County Petition at 1; Dallas County Petition at 2. Yet the mere existence of such procedures "does not in itself confer, and is not the same as, the constitutional standing required to litigate in court." *Bacon*, 411 S.W.3d at 178–79. These statutes reveal "little more than the opportunity to petition [an agency] to exercise its broad discretion so as to agree," and "a 'mere expectation' [of agreement] does not . . . confer standing to contest [the agency's] decision in the absence of a legislatively conferred right of judicial review." *Id.* at 180–81. There is a "fundamental distinction between 'standing' before an administrative agency . . . and the constitutional standing required to invoke a court's subject-matter jurisdiction." *Id.* at 178–79. As such, Texas courts of appeals have correctly held that "[i]f the [L]egislature intended to create a new justiciable right of action for a sex change order, it would say so." *McReynolds*, 502 S.W.3d at 887; *see also, e.g.*, *Araguz*, 443 S.W.3d at 245 (observing that the Family Code does not contemplate "sex change" petitions). But there is "no statutory scheme expressly authorizing sex change orders or establishing procedures for obtaining such an order," *McReynolds*, 502 S.W.3d at 888, and "implying a private cause of action in a statute that [does] not provide for one" reaches beyond "the judiciary['s] . . . jurisdictional bounds," *Tex. Med. Res., LLP v. Molina Healthcare of Tex., Inc.*, 659 S.W.3d 424, 432 (Tex. 2023) (quoting *Brown*, 156 S.W.3d at 569); *accord State v. Morales*, 869 S.W.2d 941, 949 (Tex. 1994).

Neither could a statute recognizing an informational injury—*e.g.*, a right to identification documents that affirm a person's undisclosed, subjective perception—displace the need to allege a cognizable injury in fact. Indeed, "[t]he U.S. Supreme Court [in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)] recently wrestled with similar arguments regarding . . . standing based on 'informational injury' alone." *Am. Campus Communities, Inc. v. Berry*, 667 S.W.3d 277, 288 n.6 (Tex. 2023). Unlike the statutes referenced in the petitions here, however, the law in *TransUnion* obligated defendants "to 'follow reasonable procedures to assure maximum possible accuracy' of the plaintiffs' credit files" and "create[d] a cause of action . . . to sue and recover damages for certain violations." 594 U.S. at 419, 431 (citation omitted). Still, the Court made clear that while "Congress may elevate harms that exist in the real world . . . to actionable legal status, it may not simply enact an injury into existence[] . . . to transform something that is not remotely harmful into something that is." *Id.* at 426 (internal quotations and citations omitted). "[T]he mere existence of inaccurate information in a database [was] insufficient to confer [constitutional] standing" on plaintiffs whose information had not been disseminated, regardless of the defendant's statutory obligation to assure maximum accuracy. *Id.* at 434. That claim of "harm [was] roughly the same[] . . . as if someone wrote a defamatory letter and then stored it in her desk drawer," the Court explained. *Id.* But "[a] letter that is not sent does not harm anyone, no matter how insulting." *Id.* The Court likewise rejected those plaintiffs' independent emphasis on a future risk of harm because that forecast "was too speculative to support . . . standing." *Id.* at 437–38.

Of course, the petitions underlying your inquiry not only want for a recognized "informational injury" but also depend on even greater speculation than that rejected in *TransUnion*.[8] The Travis County Petition vaguely invokes "problems with schools, voting, . . . travel, . . . obtaining insurance, employment, housing, credit, and . . . producing correct and consistent identification." Travis County Petition at 1. Even more, the Dallas County Petition's forecast of harm does not turn on the perceived disparity itself but instead suggests that receiving a "name change *without* the necessary gender marker correction" would "bias and frustrate [the petitioner's] ability to be a fully participating and contributing member of society" as well as "increase[] the chance that [the petitioner] will be subjected to discrimination, harassment, and violence, as well as denial of certain rights." Dallas County Petition at 2 (emphasis added). But the presumptive sincerity of these concerns cannot change the reality that "[s]tanding is not 'an ingenious academic exercise in the conceivable.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 566 (1992) (citation omitted). Rather than alleging a cognizable "invasion of a legally protected interest," *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 154 (Tex. 2012) (quoting *Lujan*, 504 U.S. at 560–61), both petitions allege conjectural harms that follow from non-existent interests. As a result, "[a] trial court has no more jurisdiction to deny [these petitions] than it does to grant them." *Inman*, 252 S.W.3d at 304.

Second, these petitions openly contradict any claim of causation. This independent facet of standing serves to "identify[] the proper defendants" because "a court [can] act only to redress

---

[8] It is irrelevant that the *TransUnion* plaintiffs sought damages, versus injunctive relief, as the Court highlighted the latter similarly requires a "risk of harm [be] sufficiently imminent and substantial." *TransUnion*, 494 U.S. at 435 (citing *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 414 n.5 (2013)). Under that standard, too, "plaintiffs bear the burden of pleading and proving concrete facts showing that the defendant's actual action has caused the substantial risk of harm" rather than relying on a "speculative chain of possibilities." *Clapper*, 568 U.S. at 414 & n.5.

injury that fairly can be traced to the challenged action of the defendant, and not . . . some third party not before the court.'" *Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 485 (Tex. 2018) (alteration in original) (quoting *Heckman*, 369 S.W.3d at 155). Yet neither petition names any defendant, let alone alleges a causal relationship between the perceived informational disparity and the agencies at which the petitions are ultimately directed. This is further confirmed by the proposed orders, which reveal the underlying petitions *precede* the applications they purportedly govern—directing the agencies act "upon application" by the petitioners—and demonstrate there could be no causal relationship between the putative injury and the non-party agencies. *Compare* Travis County Petition at 1–4, *and* Dallas County Petition at 1–2, *with* TC-FM-GI1-200, Final Order to Change the Sex/Gender Identifier of an Adult ("Travis County Order") at 1, tinyurl.com/Travis-County-Order (last visited Feb. 19, 2025), *and* Final Order Granting a Change of Name of Adult with Gender Marker Correction/Sex on Birth Certificate ("Dallas County Order") at 1, tinyurl.com/Dallas-County-Order (last visited Feb. 19, 2025). Again, this demonstrates that "[a] trial court has no more jurisdiction to deny [these petitions] than it does to grant them." *Inman*, 252 S.W.3d at 304.

Third, the very nature of these petitions demonstrates that they are incapable of redressing any putative injury. "Whether a plaintiff has sufficiently pled that the requested remedy will redress its harm can turn on whether the plaintiff has shown that the defendant has authority to respond to any requested injunctive relief." *Meyers*, 548 S.W.3d at 487–88. But these petitions name no defendants. Travis County Petition at 1; Dallas County Petition at 1. Far from satisfying redressability, this reveals that the ensuing orders cannot bind the non-party agencies at which they are aimed—vitiating any claim of standing. *See, e.g.*, *Lujan*, 504 U.S. at 568–70 (rejecting standing where enjoining the named defendant would not remedy the alleged injury because non-party agencies, who could not be bound, were ultimately responsible); *see also, e.g.*, *Brown*, 156 S.W.3d at 566 ("As the Attorney General is not a party in this proceeding, we cannot decide [whether he has enforcement authority] without rendering an advisory opinion[] . . . ."). Just as a plaintiff cannot "effectively . . . obtain[] a declaratory judgment . . . to [express] disagreement with the Attorney General without making him a party," *Holcomb v. Waller Cnty.*, 546 S.W.3d 833, 838 (Tex. App.—Houston [1st Dist.] 2018, pet. denied), these petitions provide no license to render judgments binding state agencies that are objective strangers to the proceedings themselves.

## B. Jurisdiction of the Party

We turn next to whether the "judicial power" could be validly invoked over non-party agencies in the proceedings you describe. *See supra* p. 2 (identifying second category of void judgments). "To issue a valid and binding judgment or order," of course, "a court must have . . . personal jurisdiction over the party it purports to bind." *Guardianship of Fairley*, 650 S.W.3d 372, 379–80 (Tex. 2022) (citing *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 7–8 (Tex. 2021)). This "vital component of a valid judgment[] is dependent 'upon citation issued and served in a manner provided for by law,'" *In re E.R.*, 385 S.W.3d 552, 563 (Tex. 2012) (quoting *Wilson v. Dunn,* 800 S.W.2d 833, 836 (Tex. 1990)), and recognizes that "the power underlying judicial authority must be based on a litigant's fair opportunity to be heard," *Fairley*, 650 S.W.3d at 388–89 (quoting *PNS Stores*, 379 S.W.3d at 274). Personal jurisdiction therefore proves "essential to invoke . . . the power conferred by the Constitution or law upon the court to hear and decide the cause." *Henderson v. Beaton*, 52 Tex. 29, 46 (1879). In this sense, "[a] complete failure

of service deprives . . . a trial court of personal jurisdiction" and renders "the resulting judgment . . . void." *E.R.*, 385 S.W.3d at 566; *accord Fairley*, 650 S.W.3d at 388.

Cases like *Mapco, Inc. v. Carter*, 817 S.W.2d 686 (Tex. 1991) (per curiam), are emblematic. There, the Supreme Court of Texas summarily reversed a judgment entered against a company that was never a party to the trial proceedings. *Id.* at 686–88. Though the plaintiffs sued two corporate defendants over a mineral estate, the trial court went beyond ordering partition among the named parties and entered an owelty award against a defendant's parent company— who was not identified "as a party" in the plaintiffs' pleadings, filed no pleadings, and for whom the record revealed no waiver of service. *Id.* at 687. This ran contrary to the settled rule: "In no case shall judgment be rendered against any defendant unless upon service, or acceptance or waiver of process, or upon an appearance." *Id.* (citing TEX. R. CIV. P. 124). As such, the court rejected the notion that generic references to the parent company itself were "sufficient to place [it] before the court" and reversed. *Id.*

*In re Suarez*, 261 S.W.3d 880 (Tex. App.—Dallas 2008, orig. proceeding), is also instructive. There, a mother sought to regain custody of her children and served a subpoena duces tecum to compel the appearance of a Department of Family and Protective Services employee during the associated proceedings. *Id.* at 881. But neither the employee nor any other agency representative appeared, and the trial court ordered sanctions against the non-parties—finding "it ha[d] jurisdiction over the subject matter and parties." *Id.* at 883. The department and its employee thereafter sought mandamus and argued that, as "non-parties to the underlying litigation, the trial court did not have personal jurisdiction over them[] and[] . . . its sanctions order [was] void." *Id.* at 882. Agreeing, the court of appeals emphasized that "[e]ven if the motion for sanctions[] . . . could stand as an independent cause of action against the relators, the trial court did not have personal jurisdiction over [them] as parties to the litigation at the time they allegedly failed to comply with the subpoena." *Id.* at 883. The court rejected the notion that a party can move "for sanctions against a non-party, serve the motion . . . with a citation informing it that [the non-party] has 'been sued,' and thereby subject the non-party to possible sanctions based on its alleged violation of a subpoena occurring before the sanctions motion was filed." *Id.* at 883–84.

Here, as in *Mapco* and *Suarez*, the infirmities you describe preclude the valid invocation of a district court's authority. You tell us that agencies like DPS and DSHS are "not provided notice of [these] proceedings," are "not named as a party-defendant to [these] proceedings," and have "not participated in them in any way." Request Letter at 2. Nonetheless, the resulting orders purport to bind both agencies—commanding that they alter government-issued documents— despite confirming that no state agencies were named as parties. Travis County Order at 2–3; Dallas County Order at 1–2. Not only does this ignore that "the power underlying judicial authority must be based on a litigant's fair opportunity to be heard," *Fairley*, 650 S.W.3d at 388 (quoting *PNS Stores*, 379 S.W.3d at 274), but this exercise runs headlong into the reality that "[a] complete failure of service deprives . . . a trial court of personal jurisdiction" and renders "the resulting judgment . . . void." *E.R.*, 385 S.W.3d at 566; *accord Fairley*, 650 S.W.3d at 388; *see also, e.g.*, *PNS Stores*, 379 S.W.3d at 273 (observing a "[f]ailure to give notice 'violates the most rudimentary demands of due process'" (citation omitted) (alteration in original)).

### C. Jurisdiction to Enter the Particular Judgment

We turn finally to the independent, constitutional impropriety of the orders you describe. *See supra* p. 2 (identifying third category of void judgments). "[A] court may have jurisdiction over the general subject matter[] yet lack the power to render a particular judgment or order in the case." *Ex parte Swate*, 922 S.W.2d 122, 126 (Tex. 1996) (Gonzalez, J., joined by Owen, J., concurring); *see also, e.g.*, *PNS Stores*, 379 S.W.3d at 272 (describing "a judgment as void when 'the court rendering judgment had . . . no jurisdiction to enter the particular judgment" (citation omitted)). Where this proves true, "[m]andamus is proper." *In re Sw. Bell Tel. Co.*, 35 S.W.3d 602, 605 (Tex. 2000) (per curiam); *see also, e.g.*, *Travelers Indem. Co. v. Mayfield*, 923 S.W.2d 590, 594 (Tex. 1996) (granting mandamus where a district court's fee-shifting order could not stand "under the guise of 'inherent authority'" without inviting "a judicial end-run around the statutory fee-shifting scheme"); *In re Collins*, 242 S.W.3d 837, 848 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (Guzman, J.) (granting mandamus for want of authority to appoint an amicus attorney based on unrelated statutes or "inherent powers"); *In re El Paso Healthcare Sys., Ltd.*, 225 S.W.3d 146, 156 (Tex. App.—El Paso 2005, orig. proceeding) (same, appointed-counsel order).

*In re Office of the Attorney General*, 456 S.W.3d 153 (Tex. 2015) (per curiam), illustrates the point. There, the Office of the Attorney General sought mandamus to vacate a trial court order directing the removal of a "family violence indicator from . . . [its] system." *Id.* at 154. Both the trial judge and the party to the original child-support proceeding "argue[d] that OAG's determination to assign the indicator is simply a preliminary administrative matter subject to judicial review," vesting trial courts with discretion "over the existence of the indicator[] as necessary to issue protective orders and prevent disclosure of certain personal information." *Id.* at 156. But "[t]hese two lines do not intersect," the Court explained. *Id.* at 157.

While "[t]he Family Code authorizes the trial court to decide whether to disclose protected information once a case has been designated with the indicator," the Court went on, "the authority *to assign* the indicator to a case rests with OAG." *Id.* (emphasis added). "Even assuming that OAG's indicator designation [could] be properly categorized as an 'administrative action,' . . . the parties ha[d] not [identified] . . . any authority expressly providing for the right to review the designation" and offered no claim that could justify the district court's order in the absence of a judicial-review statute. *Id.* (citing *Stone*, 417 S.W.2d at 385–86). As such, "[t]he Legislature ha[d] chosen to give OAG discretion . . . and ha[d] not chosen to allow trial courts to intervene, except to weigh the designation in considering a request for disclosure." *Id.* at 156. The Court also rejected the notion that the Family Code provided the "trial court carte blanche to do as it pleases" by drawing from the authority to issue "any other order." *Id.* (citing TEX. FAM. CODE § 105.006(c)(2)). "[S]tudied in context—in light of the text and structure of surrounding and related provisions—there [was] no question that 'any other order' [could not] bear the broad meaning ascribed by the trial court" and instead related only to the limited function for which the court had jurisdiction: preventing the "disclosure of protected information." *Id.* The Court thus directed vacatur of the offending order. *Id.* at 157.

The orders underlying your inquiry bear indistinguishable flaws. Even assuming the provision of a driver's license or birth certificate could constitute "administrative action," which ignores that the putative disparity arose only once the petitioners later decided the contents of these

documents were no longer accurate, both the petitions and ensuing orders invoke no authority expressly providing for judicial review. *See supra* pp. 4–5 (detailing statutory frameworks); *see also supra* pp. 6–9 (highlighting lack of consent to be sued). Neither do the petitions offer any allegation that would obviate the need for an express judicial-review statute. *See supra* pp. 5–6 (detailing lack of vested property right). Instead, these petitions and orders rely on statutes whose plain text, context, and history uniformly reveal no authority to mandate DPS or DSHS act on petitions that were not filed with them in the first instance. *See supra* pp. 4–5. "Had the legislature intended to create [this] statutory right," of course, "it would not have left it to the judicial branch to define the right's substantive elements and procedures." *McReynolds*, 502 S.W.3d at 887.

Another jurisdictional problem resides in the function of these orders. "Not only may judges and courts not suspend a statute, but neither may they supervise and direct the manner and method of its enforcement by the officers of the executive department . . . charged with the duty of enforcing [the] same." *State v. Ferguson*, 125 S.W.2d 272, 276 (Tex. 1939) (orig. proceeding); *accord Hous. Chron. Publ'g Co. v. Mattox*, 767 S.W.2d 695, 698 (Tex. 1989) (same). The Texas Constitution has long commanded that "[n]o power of suspending laws in this State shall be exercised except by the Legislature." TEX. CONST. art. I, § 28. Like the authority to issue advisory opinions, which lies beyond the "judicial power" itself, "no power is vested in the judiciary to supervise and control by injunction the manner and method of exercising [a] power" that is statutorily reserved to state agencies alone. *Ferguson*, 125 S.W.2d at 276. "[T]o do so," the Supreme Court of Texas has explained, "would be the power to set at naught a valid statute." *Id.*

Here, the orders you describe undertake more than simply supervising and controlling the discretion statutorily vested in DPS and DSHS alone. *See supra* pp. 4–5. Directing these agencies to change the contents of driver's licenses and birth certificates suspends the longstanding statutory directive that both agencies oversee the fixed contents of these documents, which can in limited circumstances be altered if "satisfactory" evidence is *submitted to* the agencies themselves but have never referenced a person's "gender." *See supra* pp. 4–5. Thus "[t]o state the nature of th[ese] order[s] is to reveal the lack of power in a judge or court to enter [them]." *Ferguson*, 125 S.W.2d at 276. Again, these petitions cannot be read to allege either that the governing statutes are themselves invalid or assert ultra vires conduct that would allow a court to compel administrative officers to effect the desired amendments. *See supra* pp. 7–9. The face of these orders instead reveals that DPS and DSHS are directed to violate the very laws they are bound to obey. This ignores the Supreme Court of Texas's admonition that "[b]efore rushing to act as enforcer, courts must be confident they are not inadvertently *undermining* a legislative choice," as is the case when "a judicial remedy . . . itself compel[s] violating some other statutory command." *In re Stetson Renewables Holdings, LLC*, 658 S.W.3d 292, 296 (Tex. 2022).

Given the foregoing, there is no jurisdictional foundation on which these orders could rest. A reviewing court would conclude the ex parte sex-change orders were void *ab initio*—even assuming jurisdiction over the proceedings and parties, *contra* pp. 4–13 (explaining otherwise)— and mandate vacatur. *See, e.g.*, *In re Off. Att'y Gen.*, 456 S.W.3d at 157; *Travelers*, 923 S.W.2d at 594; *In re Collins*, 242 S.W.3d at 848; *In re El Paso Healthcare, Ltd.*, 225 S.W.3d at 156.

**II.    Prior "corrections" should be reversed because the underlying proceedings and orders are *coram non judice*, and there can be no proof of a "gender" or "sex" change that requires correction on these facts.**

Each of the foregoing limits on district courts' share of "judicial power" lead to your second inquiry:[9] Whether agencies can correct actions taken in reliance on these void orders. Request Letter at 1, 4. Two points, detailed below, lead us to answer in the affirmative.

First, "[t]he proposition that the judgment of a court lacking jurisdiction is void traces back to the English Year Books," which deemed the concept "*coram non judice*, [*i.e.*,] before a person not a judge—meaning[] . . . the proceeding in question was not a *judicial* proceeding because lawful judicial authority was not present, and could therefore not yield a *judgment*." *Burnham v. Superior Ct. of Cal.*, 495 U.S. 604, 608–09 (1990) (citations and internal quotations omitted); *see also, e.g.*, ROBERT WYNESS MILLAR, CIVIL PROCEDURE OF THE TRIAL COURT IN HISTORICAL PERSPECTIVE 413–14 (1952) (noting Anglo-American law recognized "the void judgment [was] ineffective for any purpose and [could] be disregarded," just as Roman law deemed "the null judgment . . . legally inexistent"). The English common law recognized that without "jurisdiction of the cause, the whole proceeding is *coram non judice*." *The Marshalsea*, 10 Co. Rep. 68a, 69a, 77 Eng. Rep. 1027, 1028 (K.B. 1613). That is to say, "where there is no jurisdiction . . . there is no Judge; the proceeding is as nothing." *Perkins v. Proctor*, 2 Wils. 382, 384, 95 Eng. Rep. 874, 875 (K.B. 1768); *accord Terry v. Huntington*, Hardr. 480, 483, 145 Eng. Rep. 557, 558 (Ex. 1680) (explaining that judges who "exceed[ed] their authority[] . . . cease[d] to be [judges]"); *see also, e.g.*, 2 SIR EDWARD COKE, INSTITUTES OF THE LAWS OF ENGLAND 427 (1634) ("If [a judge] has acted without jurisdiction, he has ceased to be a judge.").

Early American practice held similarly. *See generally United States v. Nourse*, 34 U.S. 8, 32 (1835) (explaining English and American reporters "abound in cases exemplifying [the] principle" that a want of jurisdiction rendered "the whole proceeding . . . coram non judice[] and void"). Without jurisdiction, "a party whose rights [were] sought to be affected . . . [was] at liberty to repudiate its proceedings and refuse to be bound by them . . . since this [was] not mere irregular[ity] . . . but a total want of power to act at all." THOMAS M. COOLEY, TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 351 (Little, Brown & Co. 1868); *see also, e.g.*, THOMAS COOLEY, A TREATISE ON THE LAW OF TORTS 379, § 210 (Callaghan & Co. 1907) (observing in the context of judicial immunity that a judge not "clothed with jurisdiction[] . . . is but . . . falsely assuming an authority he does not possess" and "is not judge when he assumes to decide cases of a class which the law withholds from his cognizance[] or cases between persons who are not[] . . . before him"). Courts therefore used the term "[c]oram non judice . . . interchangeably . . . both [for] lack of

---

[9] These settled, foundational limits on district courts' authority also intersect with your suggestion that the forum-specific nature of these orders is no accident. You note that "[t]his practice seems to be a part of a years-long and state-wide effort to alter government records to reflect gender identity," which involves forum "shopping for 'friendly' judges" who facilitate efforts "to evade court opinions holding the practice unlawful." Request Letter at 3 (collecting sources). If true, this raises a serious question—beyond those included in your request, and involving fact questions outside the scope of this opinion—as to these judges' continued fitness for office. *See, e.g.*, *In re Ginsberg*, 630 S.W.3d 1, 9–18 (Tex. Spec. Ct. Rev. 2018) (rejecting similar claims of judicial misconduct where the underlying conduct was neither willful, persistent, nor implicated a settled area of the law).

subject matter jurisdiction and [for] lack of personal jurisdiction because either defect left courts with no 'judicial' power" to exercise. Ingrid Wuerth, *The Due Process and Other Constitutional Rights of Foreign Nations*, 88 FORDHAM L. REV. 633, 667–68 (2019) (collecting cases); *see also, e.g., Voorhees v. Jackson, ex dem. Bank of U.S.*, 35 U.S. 449, 450 (1836) (observing that "[t]he line which separates error in judgment from the usurpation of power is very definite," and describing judgments without jurisdiction as "mere waste paper").

Texas likewise recognized "classes of cases over which a court has not, under the very law of its creation, any possible power" and whose "entire proceedings are [thus] *coram non judice*." *York v. State*, 373 S.W.3d 32, 41 (Tex. 2012) (quoting *Templeton v. Ferguson*, 33 S.W. 329, 332 (1895)). "In such cases," there was "no difficulty or hesitation in ignoring its proceedings or decrees" because "the court [was] without jurisdiction of the subject-matter, the status of the parties, or the person of the defendant." *Templeton*, 33 S.W. at 332. Unlike erroneous judgments, which could "be avoided by such proceedings as the law provide[d] but . . . [were otherwise] binding on the parties to the action," a judgment rendered without jurisdiction was "necessarily void[] and b[ound] no person or thing." *Stuart v. Anderson*, 8 S.W. 295, 299 (Tex. 1888); *see also, e.g., Easterline v. Bean*, 49 S.W.2d 427, 429 (Tex. 1932) (explaining "that a void judgment is one entirely null within itself, and which is not susceptible of ratification or confirmation").

With this backdrop in mind, the situation you describe proves similar to that confronted in *Tex. Dep't of Pub. Safety v. Morris*, 436 S.W.2d 124 (Tex. 1968). That case arose after DPS "gave notice to eighty-three respondents to surrender their licenses and automobile registrations," and a group of individuals "appealed [those] suspension orders to the [Shelby] County Court . . . where none . . . had ever been a resident." *Id.* at 125. Though "[t]he Shelby County Court issued orders which stayed each of [DPS's] suspension orders, . . . the Department ignored them" because "that court had no jurisdiction" and DPS correctly "proceeded with the next step required by law, which was the enforcement of [the underlying] suspension[s]." *Id.* at 125–27. On appeal, the Supreme Court of Texas endorsed the Department's approach—explaining "that the suspension orders were in force at all times[] and were never stayed." *Id.* at 127. The Court rejected the notion that "the Department could not ignore" the stay orders because the underlying petitions "omitted any statement about the residence of the one appealing," and the Shelby County Court was not "exercising its general jurisdiction" by acting on petitions that it "had no jurisdiction to entertain." *Id.* at 125–27. Put simply, the Shelby County Court orders "were void." *Id.*

Here, as in *Morris*, DPS and DSHS were (and remain) within their authority to disregard the facially void orders described in your inquiry. The underlying proceedings were *coram non judice*—failing all three heads of jurisdiction, *see supra* pp. 2–15—and the resulting orders had no foundation in the "judicial power" endowed to district courts. That is to say, the district courts you describe were "without jurisdiction of the subject-matter, the status of the parties, or the person of the defendant." *Templeton*, 33 S.W. at 332. Over a century of precedent therefore reveals the ensuing orders were "necessarily void" and bound "no person or thing." *Stuart*, 8 S.W. at 299; *see also, e.g., Easterline*, 49 S.W.2d at 429; *Henderson*, 52 Tex. at 45–46.

Second, as in *Morris*, both DPS and DSHS should continue to abide by their legal obligation—irrespective of the facially void orders you reference—to maintain a uniform system of driver's licenses and birth certificates. *See supra* pp. 4–5 (detailing both frameworks). An

agency's power extends only to that the "Texas Legislature has expressly conferred upon it and those implied powers that are reasonably necessary to carry out its statutory duties." *Tex. State Bd. of Exam'rs of Marriage & Fam. Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 33 (Tex. 2017); *see also, e.g.*, *Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 316 (Tex. 2001) (explaining an agency cannot "exercise what is effectively a new power, or a power contradictory to the statute"). Yet there is no statute or regulation that would permit the inclusion of a person's perceived "gender" on driver's licenses or birth certificates.

Nothing in the orders you describe purports to change that DPS must issue driver's licenses "contain[ing] the same type of information" and cannot "include any information that [the Transportation Code] does not reference or require." TEX. TRANSP. CODE § 521.121(e)(1)–(2). The Transportation Code provides that "driver's license[s] must include" a "brief description of the holder," *id.* § 521.121(4), and DPS's unchallenged regulations explain that this description includes a person's "sex" in addition to their race, eye color, height, hair color, and weight, 37 TEX. ADMIN. CODE § 15.26. "Gender" is not contemplated under this rubric. DPS therefore remains obligated, as a matter of law, to exercise only the powers granted by the Legislature—meaning any unlawfully altered driver's licenses must be corrected, immediately.

The same is true of birth certificates, whose "form and contents" are prescribed and maintained by DSHS alone. TEX. HEALTH & SAFETY CODE § 192.002(a); *accord* 25 TEX. ADMIN. CODE § 181.13(a) (same, explaining that these "items will be designated on department forms"). Texas law makes no provision for the inclusion of a person's "gender" on their birth certificate and instead compels DSHS to document historical information, which "may not be changed" except where "proved by satisfactory evidence to be inaccurate." TEX. HEALTH & SAFETY CODE § 191.028(a)–(b). Suffice it to say there can be no inaccuracy in a "gender" designation that does not exist. Like DPS, DSHS remains legally obligated to exercise only these contemplated powers—meaning unlawfully altered birth certificates also require immediate correction.

Neither can DPS or DSHS change a person's "sex" designation without supporting evidence that, as a matter of law, cannot exist on the facts you describe. "[I]t remains medically impossible to truly change the sex of an individual because this is determined biologically at conception," Tex. Att'y Gen. Op. No. KP-0401 (2022) at 2–3, and an individual's personal perception of "sex" does not change that "[p]hysical differences between men and women" are "enduring," *United States v. Virginia*, 518 U.S. 515, 533 (1996). Put simply, "some things . . . cannot [be] will[ed] into being." *Littleton v. Prange*, 9 S.W.3d 223, 231 (Tex. App.—San Antonio 1999, pet. denied) (holding that "the legislature intended the term 'inaccurate' in [the Health and Safety Code] to mean inaccurate at the time the certificate was recorded; that is, at the time of birth"); *see also, e.g.*, *Rocher*, 2016 WL 4131626, at *2 (holding that "a mere request for a change in gender designation is not evidence supporting such a change"). Though "[n]eologisms like 'sex assigned at birth' and 'gender identity'" may be "intelligible as theoretical concepts," they "simply

do not correspond to reality."[10] *State v. Loe*, 692 S.W.3d 215, 242 (Tex. 2024) (Blacklock, J., joined by Devine, J., concurring).

This is particularly salient when the statutory reality is such that both driver's licenses and birth certificates have included a person's "sex" since 1936, TEX. REV. CIV. STAT. art. 6687a, § 5(b) (Vernon's 1936) (driver's licenses); TEX. REV. CIV. STAT. art. 4477, R. 47a (Vernon's 1936) (birth certificates)—a time preceding the term "gender identity,"[11] which "apparently first appeared in an academic article in 1964," *Loe*, 692 S.W.3d at 240 n.4 (quoting *Bostock v. Clayton Cnty.*, 590 U.S. 644, 715 (2020) (Alito, J., dissenting)). Without a statutory definition of "sex," of course, "we must consider the term's original public meaning[] . . . when [the statute was] enacted.'" *VIA Metro. Transit v. Meck*, 620 S.W.3d 356, 369 & n.15 (Tex. 2020) (alteration in original) (quoting *Taylor v. Firemen's & Policemen's Civ. Serv. Comm'n of City of Lubbock*, 616 S.W.2d 187, 189 (Tex. 1981)); *accord* ANTONIN SCALIA & BRIAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 16 (2012) (same).

It is unreasonable to suggest that the original public meaning of "sex," in 1936, somehow included a psycho-social concept that had not yet been invented. To be sure, contemporary definitions of "sex" leading up to 1936 confirmed the observable, biological reality that had endured for millennia: "Sex" was commonly understood as "pertaining to the distinctive function of the male or female in reproduction." WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 1931–32 (1910); *accord* 9 OXFORD ENGLISH DICTIONARY 577 (1933) (referencing "[e]ither of the two divisions of organic beings distinguished as male and female respectively"). This remained true even after the concept of "gender identity" revealed itself within academic discourse. *See, e.g.*, AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1976) (defining "sex" as "[t]he property or quality by which organisms are classified according to their reproductive functions"); WEBSTER'S NEW WORLD DICTIONARY (1972) (defining "sex" as "either of the two divisions, male or female, into which persons, animals, or plants are divided, with reference to their reproductive functions"); WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY (1969) (defining "sex" as "either of two divisions of organisms distinguished respectively as male or female"). This leaves no question that the term "sex" did not contemplate a modern concept that neither existed before (nor was commonly recognized after) the governing statutory framework was conceived.

---

[10] Recent federal guidance likewise confirms that the "sexes are not changeable and are grounded in fundamental and incontrovertible reality," explaining "sex" is an "immutable biological classification" that "does not include the concept of 'gender identity.'" Exec. Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025).

[11] "Transsexualism," too, "was introduced in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders in 1980 and was replaced in 1994 by 'gender identity disorder.' AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 784–85 (4th ed. 1994)." *Loe*, 692 S.W.3d at 240 n.4. "At the time, it was categorized under 'sexual and gender identity disorders'" and "[o]nly in 2013 did 'gender dysphoria' replace 'gender identity disorder' in the official diagnostic manual. *Gender Dysphoria Diagnosis*, Am. Psychiatric Ass'n, https://www.psychiatry.org/psychiatrists/diversity/education/transgender-and-gender-nonconforming-patients/gender-dysphoria-diagnosis." *Id.*

**S U M M A R Y**

The "judicial power" endowed to district courts does not countenance ex parte orders directing state agencies to amend a person's biological sex on driver's licenses or birth certificates. The underlying proceedings are *coram non judice*, and the resulting orders are void. State agencies must immediately correct any unlawfully altered driver's licenses or birth certificates that were changed pursuant to such orders.

Very truly yours,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

LESLEY FRENCH
Chief of Staff

D. FORREST BRUMBAUGH
Deputy Attorney General for Legal Counsel

JOSHUA C. FIVESON
Chair, Opinion Committee